[No. S004707. Crim. No. 25218. Dec. 3, 1992.]

THE PEOPLE Plaintiff and Respondent, v.
ANDERSON HAWTHORNE, JR., Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Therene Powell and Sandra L. Goldsmith, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, John R. Gorey, William T. Harter, Susan D. Martynec, Susan Lee Frierson and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—

INTRODUCTION

A jury found Anderson Hawthorne, Jr., guilty of the first degree murders of Kirt Thomas and Jimmy Lee Mamon (Pen. Code, § 187)[1] and found true the special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)). The jury further adjudged defendant guilty of the attempted murders of Craig Russell, Robert Lee Sally, and Shedrick Evans, also finding true allegations he inflicted great bodily injury on Russell (§ 12022.7) and used a firearm in the commission of each offense (§ 12022.5). A penalty verdict of death was returned. Thereafter, the trial court denied defendant's motions for a new trial (§ 1181) and for modification of the verdict (§ 190.4, subd. (e)). This appeal is automatic (§ 1239, subd. (b)). We affirm the judgment in its entirety.

I. FACTS

A. *Guilt phase.*

The evidence adduced at trial suggests the crimes were precipitated by some underlying but unspecified gang hostility.[2] On the evening of December 18, 1982, five or six young men, including the murder victims, were engaged in a crap game in the parking lot behind the Family Arcade on San Pedro Street in Los Angeles. About 6 p.m., Frederick Boone, son of the arcade proprietor, went to break up the game. As he walked back inside the establishment, he heard five shots from the direction of the parking lot. Upon returning, he saw Kirt Thomas holding his stomach and Jimmy Mamon lying on the ground apparently unconscious. Boone grabbed a rifle and chased the assailant over the wall between the parking lot and a back alley, where the gunman jumped into a car waiting with its door open. Boone could not identify defendant as the shooter, but selected him in a physical lineup as the person who had brandished a chrome .38-caliber revolver at Boone and several others, including Robert Sally, three weeks earlier in front of the Family Arcade. Defendant had displayed the weapon after Sally said, "What's up, Cuz?," connoting he was a Crips gang member. Defendant responded, "This is Blood," apparently referring to his membership in the

[1]Except as otherwise indicated, all further statutory references are to the Penal Code.

[2]Defendant and the victims belonged to or associated with members of rival Los Angeles street gangs, the Bloods and the Crips. The evidence, however, did not establish that the shootings were in retaliation for some particular incident of gang conflict.

rival Blood gang and suggesting an intent to engage in some confrontational activity.

Also about 6 p.m. the evening of the shootings, Ivory Corothers was walking down the alley toward the Family Arcade. He was acquainted with Boone and some of the victims and familiar with the area. As he started to open a gate leading from the alley to behind the arcade, he heard someone say "Stop" and saw defendant leaning over the wall. Defendant was holding a handgun, which he initially pointed at Corothers and then at the individuals kneeling in the parking lot shooting dice. Corothers heard defendant fire several shots at the crowd and saw him flee out the alley. Defendant was wearing a black sweat suit. Several days later, Corothers identified defendant from photographic and physical lineups.

Although not participating himself, Craig Russell was watching others shooting dice behind the Family Arcade when someone holding a snub-nosed .38-caliber revolver leaned over the back wall, hollered, "Guess who? Piru," and began firing at the crowd. Russell, Jimmy Mamon, and Kirt Thomas were hit by the gunfire. Mamon received a fatal bullet wound in the head, and Kirt Thomas died of a gunshot to the abdomen. Russell survived but was in traction for three weeks and still had bullet fragments in his right arm at the time of trial. He was unable to identify the assailant.

Shedrick Evans was in the parking lot playing in the crap game at the time of the shooting. He also heard someone say, "Guess who? Piru," and then the sound of gunfire. He observed Mamon get shot in the head and saw Thomas with blood on his chest; Evans was hit in his right hand. He subsequently identified defendant as the shooter, noting he was wearing a black and white striped sweatshirt at the time. Evans also described defendant as the person he had seen from inside the arcade three weeks earlier display a handgun and pistol-whip Robert Sally or another young man. Defendant wore a black and white sweat shirt during this incident as well.

Robert Sally was among those shooting dice in the parking lot when he saw someone appear over the back fence and start firing a handgun. In a statement to the police at the time, Sally identified defendant as the gunman, the same man who had also assaulted him three weeks earlier in the incident observed by Boone and Evans. He repeated the identification at subsequent photographic and physical lineups. At trial, however, he repudiated his previous statements, which were then offered for impeachment.

The police arrested defendant the day after the shooting and found a black jogging suit with a white stripe in his bedroom along with other evidence

suggesting membership in or affiliation with the Bloods.[3] Scientific analysis established that the fatal gunshots came from a .38-caliber revolver recovered from the engine compartment of a Cadillac parked in the driveway of defendant's residence and belonging to his stepfather. Police found ammunition and a red bandana along with the weapon.

The prosecution also presented expert testimony regarding gang activity and culture, particularly relating to the rivalry between the two prominent Los Angeles street gangs, the Crips and the Bloods. Each major group has numerous "sets" or smaller units, usually organized by streets or neighborhoods, which may identify their affiliation by certain colors, clothing, and body tattoos. The intensity of their rivalry often precipitates hostile confrontation resulting in serious injury and death. According to one expert witness, the words "84th Street" tattooed on defendant's left hand indicated membership in the 84th Street Swan gang, a subset of the Bloods. "Piru" also denotes affiliation with the Bloods.

The defense presented evidence of mistaken or fabricated identification. Dr. William Shomer, a psychologist, testified that the accuracy of an eyewitness identification can be influenced by a number of factors, particularly when the initial observation occurs under stressful circumstances such as the presence of a weapon. Thereafter, a mistaken identification tends to become reinforced by repeated exposure to a certain individual during police and courtroom proceedings.

With respect to a possible fabrication, Reynaldo Williams recounted statements made to him by Robert Sally while in county jail suggesting that Sally's identification was motivated by revenge against the Pirus and that defendant was not involved in the shooting. Jerome Moody was with defendant during the brandishing in front of the Family Arcade, and testified that he and defendant were attacked by members of the East Coast 102 Crips to which Robert Sally belonged. Defendant did not have a gun and only sought to defend himself with a pair of vise grips. Moody also stated that while in county jail he heard Sally deny defendant's participation in the shooting.

Members of defendant's family presented alibi evidence. According to his mother and sister, defendant was at home the entire day of the shooting because of constipation and did not change from his night clothes. The police removed the jogging suit from a box of clothing belonging to his brother. On the day of his arrest, defendant's mother and stepfather went to

[3]The police found a photograph album containing a picture of defendant wearing a red jacket; red is the identifying color of the Bloods, while blue denotes the Crips. Attached to the picture was a newspaper clipping of the word "Blood."

a swap meet in the Cadillac, which was tampered with later that evening by persons unknown.

Defendant testified in his own behalf. He denied any participation in the shooting, stating he had been home ill all that day. He had gotten the tattoo on his hand while in jail and it referred to the year 1984. According to defendant, Robert Sally's aggressive confrontation caused the earlier hostilities in front of the Family Arcade; he responded to Sally's use of force by defending himself with a pair of vise grips from his bicycle. Defendant stated he only used guns for burglaries and occasionally stored them for other gang members.

B. *Penalty phase.*

At the penalty phase, the prosecution presented evidence of defendant's conviction on two counts of armed robbery for which he served a term of imprisonment.

Kalvin Gooden testified that in July 1978 defendant took some radio knobs and cassettes and attempted to take the radio from his car. When Gooden went to defendant's house to retrieve the stolen objects, defendant confronted him with a handgun and said, "I'm going to kill you."

In November 1979, defendant grabbed Paul Herbert while Herbert was walking down the street with a companion and hit him in the eye with a gun. The assault occurred without warning; and afterward defendant made several allusions to Herbert's (nonexistent) affiliation with a Crips gang. He then made threats against the victim's companion, Norman Flott, and hit Flott with some object as he fled the scene.

The defense offered evidence that Kalvin Gooden had been very confrontational when he attempted to retrieve his property and that defendant only used a toy gun to scare Gooden away from the residence.

Family members testified to defendant's positive qualities and recounted that he started having difficulties at the age of 14, when an older sister was killed in an automobile accident. Although he had problems with his school work, possibly due to head injuries when he was young, he was helpful around the house and protective of his mentally ill brother; his mother depended upon him, particularly after his parents separated. Christopher Marshall, for whom defendant worked on an occasional basis, described him as a very good and willing worker.

## II. DISCUSSION

A. *Exclusion of Shedrick Evans's preliminary hearing testimony.*

On cross-examination of Shedrick Evans, the defense inquired regarding statements made by the police in presenting the photographic lineup from which Evans identified defendant as the assailant, in an attempt to demonstrate that overly suggestive procedures had tainted Evans's selection. ▮▮▮▮ When Evans professed a partial loss of memory as to some of these statements, the defense sought to impeach him with his preliminary hearing testimony either as a prior inconsistent statement (Evid. Code, § 1235)[4] or as prior recorded testimony (Evid. Code, § 1291).[5] After observing Evans testify, the court found his memory loss genuine, not evasive; hence, his trial testimony did not give rise to any "inconsistency" within the meaning of Evidence Code section 1235. (See, e.g., *People* v. *Green* (1971) 3 Cal.3d 981, 987-989 [92 Cal.Rptr. 494, 479 P.2d 998].) The court also impliedly determined he was not "unavailable" as required for the admission of prior recorded testimony pursuant to Evidence Code section 1291. (See Evid. Code, § 240 [defining "unavailable as a witness"]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 518-519 [194 Cal.Rptr. 431, 668 P.2d 738].) It therefore refused the proffered impeachment.

▮▮▮▮ On appeal, defendant does not contest the court's rulings under Evidence Code section 1235 or 1291 as currently construed. Nor does he question the fundamental precepts underlying the exclusion of hearsay. (See *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 298 [35 L.Ed.2d 297, 310-311, 93 S.Ct. 1038].) Rather, he broadly contends that statutory restrictions on the admission of prior recorded testimony "may not be applied mechanistically to defeat the ends of justice" (*id.*, at p. 302 [35 L.Ed.2d at pp. 312-313]) and deprive him of his due process right to present a defense.

---

[4]Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Under this provision, prior inconsistent statements are admissible to prove their substance as well as to impeach the declarant. (See generally, *In re Johnny G.* (1979) 25 Cal.3d 543, 550-556 [159 Cal.Rptr. 180, 601 P.2d 196] (conc. opn. of Mosk, J.).)

[5]Evidence Code section 1291 states in pertinent part:

"(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:

"(1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or

"(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing. . . ."

According to defendant, the trustworthiness and reliability of this form of hearsay, given under oath and subject to cross-examination, suffice to establish its admissibility, at least when critical to exonerating the accused. (See *ibid.*; see also *Green* v. *Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 741, 99 S.Ct. 2150].)

We do not read *Chambers* v. *Mississippi, supra,* 410 U.S. 284, as expansively as defendant urges; nor do the facts of this case come within its rationale. The defendant there was charged with the killing of a police officer. Prior to trial, one McDonald signed a confession to the murder and made similar inculpatory statements to others. When called by the defense at trial, however, he denied any involvement and repudiated his confession. As a result of "the strict application of certain Mississippi rules of evidence" (*id.,* at p. 289 [35 L.Ed.2d at p. 305]), Chambers was foreclosed from the opportunity "either to cross-examine McDonald [under the 'voucher' rule limiting the right to confrontation unless the witness is 'adverse' to the accused] or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity [due to the limitation on admission of hearsay statements against penal interests]." (*Id.,* at p. 294 [35 L.Ed.2d at p. 308].)

The Supreme Court found a denial of due process not because the trial court precluded hearsay bearing "persuasive assurances of trustworthiness" (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 302 [35 L.Ed.2d at pp. 312-313]) but because the combined effect of the two procedural constraints excluded potentially exculpatory evidence crucial to the defense. (*Id.,* at pp. 294, 297-298, 302 [35 L.Ed.2d at p. 308, 310-311, 312-313].) Indeed, the court concluded only "that *under the facts and circumstances of this case* the rulings of the trial court deprived Chambers of a fair trial." (*Id.,* at p. 303 [35 L.Ed.2d at pp. 313-314], italics added; see also *Green* v. *Georgia, supra,* 442 U.S. at p. 97 [60 L.Ed.2d at p. 941] ["In these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' "].)

As the high court made equally clear, however, "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (*Chambers* v. *Mississippi, supra,* 410 U.S. at pp. 302-303 [35 L.Ed.2d at pp. 312-313].) The court expressly declined to decide whether Mississippi's preclusion of hearsay statements against penal interest "might serve some valid state purpose by excluding untrustworthy testimony." (*Id.,* at p. 300 [35 L.Ed.2d at pp. 311-312].) It sufficed that

implementation of the rule against Chambers debarred evidence "critical" to his defense notwithstanding overwhelming indicia of its reliability. (*Id.*, at p. 302 [35 L.Ed.2d at pp. 312-313].)

Defendant has failed to present a similarly compelling case. ■ To begin with, foundational prerequisites are fundamental to any exception to the hearsay rule. (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 302 [35 L.Ed.2d at pp. 312-313]; *California* v. *Green* (1970) 399 U.S. 149, 154 [26 L.Ed.2d 489, 494-495, 90 S.Ct. 1930]; cf. *Washington* v. *Texas* (1967) 388 U.S. 14, 23, fn. 21 [18 L.Ed.2d 1019, 1025-1026, 87 S.Ct. 1920] [state may provide for testimonial privileges and nonarbitrary rules disqualifying certain witnesses].) As a general proposition, criminal defendants are not entitled to any deference in the application of these constraints but, like the prosecution, "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 302 [35 L.Ed.2d at pp. 312-313].)

■ Furthermore, the restrictions imposed under Evidence Code sections 1235 and 1291 are neither "archaic, irrational, and potentially destructive of the truth-gathering process" (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 296, fn. 8 [35 L.Ed.2d at pp. 309-310]) nor "the subject of considerable scholarly criticism" (*id.*, at p. 300, fn. omitted [35 L.Ed.2d at pp. 311-312]; see *California* v. *Green, supra,* 399 U.S. at pp. 154-155 [26 L.Ed.2d at pp. 494-495]; cf. *People* v. *Spriggs* (1964) 60 Cal.2d 868, 870 [36 Cal.Rptr. 841, 389 P.2d 377] [prior rule foreclosing admission of declarations against penal interest "vigorously criticized by the scholars" and based on historical accident]). Nor do they "arbitrarily exclude[ ] material portions of [a witness's] testimony." (*Rock* v. *Arkansas* (1987) 483 U.S. 44, 55 [97 L.Ed.2d 37, 48-49, 107 S.Ct. 2704].) On the contrary, they reasonably and rationally relate to the particular hearsay exception concerned. (Compare *People* v. *Sam* (1969) 71 Cal.2d 194, 209-210 [77 Cal.Rptr. 804, 454 P.2d 700] [hearsay not admissible under Evid. Code, § 1235, when witness testifies to lack of memory: no "inconsistency" and therefore no impeachment value] with *People* v. *Green, supra,* 3 Cal.3d at p. 988 [inconsistency in effect, rather than contradiction in express terms, determines admissibility of witness's prior statement]; see *People* v. *Rojas* (1975) 15 Cal.3d 540, 549 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127] [hearsay admitted under Evid. Code, § 1291, based on " 'simple principle of *necessity,*—i.e., the absence of any other means of utilizing the witness' knowledge' "]; see generally, *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) In addition, trial courts do not "mechanistically" apply these exceptions, but exercise broad discretion in determining

compliance with foundational requirements in light of countervailing constitutional considerations. (*People* v. *Enriquez, supra,* 19 Cal.3d at p. 235; *People* v. *Rios* (1985) 163 Cal.App.3d 852, 863 [210 Cal.Rptr. 271]; see *People* v. *Green, supra,* 3 Cal.3d at pp. 987-989.)

"As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Nor do we discern any fundamental unfairness or denial of due process in their particular operation here. The exculpatory value of the excluded evidence was tangential at best, relating as it did to possible impeachment of the witness's recollection of police identification procedures. It would not have directly impugned Evans's identification either at the photographic lineup or during court proceedings at the preliminary hearing or at trial. (See *Dutton* v. *Evans* (1970) 400 U.S. 74, 87 [27 L.Ed.2d 213, 226, 91 S.Ct. 210].) The prosecution also presented other eyewitness testimony the defense made no serious attempt to undermine as well as strong physical evidence connecting defendant to the crimes, including the murder weapon and similar clothing found at his residence. Hence, the exclusion of Evans's preliminary hearing testimony on this minor point could not have impaired the right to present a defense.

Federal authorities cited by defendant do not alter our conclusion.[6] In *Rock* v. *Arkansas, supra,* 483 U.S. 44, the United States Supreme Court ruled unconstitutional the state's per se exclusion of the defendant's posthypnotic testimony because of the "significant adverse effect" on her ability to testify, which "virtually prevented" her from presenting any exculpatory evidence. (*Id.,* at p. 57 [97 L.Ed.2d at pp. 49-50]; cf. *People* v. *Shirley* (1983) 31 Cal.3d 18, 67 [181 Cal.Rptr 243, 723 P.2d 1354] [rule excluding posthypnotic testimony of witnesses "subject to a necessary exception [for defendant] to avoid impairing the fundamental right of an accused to testify in his own behalf"].)

Similarly, in *Washington* v. *Texas, supra,* 388 U.S. 14, a Texas statute conclusively barred a convicted accomplice from testifying for the defendant

[6]The fact that Evans's preliminary hearing testimony would be admissible as a prior statement under the Federal Rules of Evidence is of little analytical moment. (See Fed. Rules of Evid., rule 804(a)(3); see also *Dutton* v. *Evans, supra,* 400 U.S. at pp. 81-83 [27 L.Ed.2d at pp. 222-224].) As the Supreme Court has often reiterated, the states enjoy substantial discretion in structuring the procedural framework of criminal trials. (*Marshall* v. *Lonberger* (1983) 459 U.S. 422, 438, fn. 6 [74 L.Ed.2d at 646, 661-662, 103 S.Ct. 843]; *Patterson* v. *New York* (1977) 432 U.S. 197, 201 [53 L.Ed.2d at 281, 286-287, 97 S.Ct. 2319]; *Chambers* v. *Mississippi, supra,* 410 U.S. at pp. 302-303 [35 L.Ed.2d at pp. 312-314].) According due deference to these legislative choices, our evaluation of Evidence Code sections 1235 and 1291 must end with the determination that in this case they did not impermissibly interfere with defendant's due process right to present a defense.

even though the testimony was relevant and material to the defense. The disqualification derived from common law rules predating the Judiciary Act of 1789 and was, in the court's analysis, irrational in its premise and absurd in its application. (*Id.*, at pp. 22-23 [18 L.Ed.2d at pp. 1024-1026].) The court found the defendant's Sixth Amendment right to present a defense thus violated "by arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief." (*Id.*, at p. 22 [18 L.Ed.2d at pp. 1024-1025]; see also *People* v. *Spriggs, supra*, 60 Cal.2d at pp. 870-875.)[7]

Evidence Code sections 1235 and 1291 do not create categorical or conclusive limitations on the admission of relevant evidence or impose unreasonable foundational prerequisites. More significantly, in this case neither operated to foreclose the right to present a defense or otherwise deprive defendant of due process.

B. *Prosecutor's guilt phase argument.*

■ Relying on *People* v. *Perry* (1972) 7 Cal.3d 756, 789-791 [103 Cal.Rptr. 161, 499 P.2d 129], defendant charges the prosecutor with prejudicial misconduct during guilt phase argument because she impugned the integrity of his counsel, in part by quoting from Justice White's dissenting opinion in *United States* v. *Wade* (1967) 388 U.S. 218, 256-258 [18 L.Ed.2d 1149, 1174-1175, 87 S.Ct. 1926], to the effect that law enforcement has an obligation to ascertain "the true facts surrounding the commission of the crime" (*id.*, at p. 256 [18 L.Ed.2d at p. 1174]), which defense counsel do not.[8] The trial court overruled defendant's objection to the use of Justice White's observations but admonished the jury not to consider any citations of judicial statements in deciding the case. The court had also given the standard instruction that statements of counsel were not evidence.

---

[7]*Webb* v. *Texas* (1972) 409 U.S. 95 [34 L.Ed.2d 330, 93 S.Ct. 351] (per curiam), also cited by defendant, did not concern a state rule of evidence, arbitrary or otherwise. Rather, the Supreme Court reversed the defendant's conviction on due process grounds because the trial judge's lengthy and gratuitous admonition on the dangers of perjury directed exclusively to the sole defense witness coerced the individual into refusing to testify. (*Id.*, at p. 96 [34 L.Ed.2d at p. 332].)

[8]In closing argument the prosecutor stated the following:

"It's always very interesting to me how when defense counsel argues, it seems to be that when the evidence is particularly weak in a case, they will argue the evidence. But when the evidence is strong, as in this case they argue—the attack on the People and on the police [*sic*] as we have seen through [defense counsel's] argument yesterday.

"They shift the focus away, if you will notice, from who is really on trial on [*sic*] this case, and that is Anderson Hawthorne, to what did the police do wrong, what did the prosecution do wrong, what could they have done differently.

"If you will notice yesterday during [defense counsel's] closing arguments, that neither of them discussed the testimony of their client, of Anderson Hawthorne.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The trial court should not have sanctioned the prosecutor's comments. The closing statements of counsel should relate to the law and the facts of the case as each side interprets them. Whether or not attributed, the views expressed in Justice White's dissent interject an extraneous generalization, potentially diverting the jury's attention from the specifics upon which they must focus. Moreover, this generalization "is not one that is shared by all judges or courts. It paints with too broad a brush." (*People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 871 [171 Cal.Rptr. 106], disapproved on another point

---

"And again, I submit to you that the reason for that is to shift the focus away from the defendant and put the police on trial and put the DA on trial.

"So please remember during your deliberations that it's that man right there, Anderson Hawthorne, and that's who you are to consider whether he is guilty or not guilty of the crimes as you have heard them.

"Believe me, this is not the first case in which one wishes that more things had been done by the police. As you have been told during the voir dire process, this is not television, this is real life. And it's difficult some three years later to go back and think what should have been done to anticipate arguments that may come about years from when the actual crime was committed. The police in this case did the best job they can. We have given you all the available evidence.

"And with that, I would like to just read something to you that has been stated, and that is as follows: Keeping what I have said before in mind.

" 'Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime.

" 'To this extent, our so-called adversary system is not adversary at all, nor should it be.

" 'But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but we also insist that he defend his client whether he is innocent or guilty.

" 'The State has the obligation to present the evidence. Defense counsel need present nothing. Even if he knows what the truth is. He need not furnish any witness to the police or reveal any confidences of his client or furnish any other information to help the prosecution's case.

" 'If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or undecisive, that would be his normal course.

" 'Our interest in not convicting the innocent permits counsel to put the State's case in the worse possible light regardless of what he thinks or knows to be the truth.

" 'Undoubtedly, there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying.

" 'In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little if any relation to the search for truth.' "

The prosecutor then went on to discuss the relative significance of the testimony of various witnesses.

Initially, the prosecutor expressly stated "this is an excerpt from Justice White of the United States Supreme Court, from his dissenting opinion in United States v. Wade." Defendant immediately objected, and the court took the matter under submission. When argument resumed the next day, the prosecutor quoted as indicated above but did not attribute the remarks.

in *People* v. *Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803].) We therefore disapprove its use, even in response to a personal attack by defense counsel. (*Ibid.*)

As in *People* v. *Perry, supra,* however, we reject the possibility the remarks prejudiced defendant. (7 Cal.3d at pp. 790-791.) The prosecutor did not express any improper personal opinions regarding defendant's guilt or the credibility of witnesses. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) This portion of the argument was relatively brief and, especially when viewed in context, hardly so inflammatory as to distract the jury from a thorough and reasoned evaluation of the evidence. (See *People* v. *Perry, supra,* 7 Cal.3d at pp. 790-791.) Finally, the court specifically admonished the jury "not to consider any citations or any judge's statements in any case . . . . It is not to be part of your consideration . . . ." We find no likelihood that the jury failed to place the arguments of counsel in proper perspective or that the objectionable comments materially contributed to the verdict. (*Id.,* at p. 790.)

C. *Trial court's response to jury inquiry during guilt phase deliberation.*

Defendant raises numerous claims of error concerning the trial court's response to an inquiry from the jury shortly before it reached the guilt phase verdict. Before discussing his contentions, some factual background is in order:

The guilt phase deliberations began December 4, 1985. On the afternoon of December 16, the bailiff received a note from the jury: "What do we do now? After much extra deliberation one member of the jury is not sure whether the defendant is guilty or not guilty." At the time, the trial judge, Judge Lew,[9] was at home on vacation. The clerk's minutes contain the only contemporaneous record of what then transpired; they reflect the following: "A written question is received from the jury. The Bailiff calls Judge Lew at home and receives instructions which he relays to the jury. The question is filed and placed in the court file."

On June 8, 1987, on motion of the defense, Judge Munoz[10] settled the record regarding the jury note as follows: "On December 16, 1985, the trial judge was called at home by the bailiff and told that the jury had reported that one member was undecided. The court provided instructions to the

---

[9]As will appear, the procedural background of this issue involved the participation of several judicial officers. When necessary to avoid confusion, we will refer to each by name.

[10]See footnote 9, *ante.* At the time of this first settled statement proceeding, Judge Lew had been appointed to the federal bench and was unavailable to settle the record. (See Cal. Rules of Court, rule 51.)

bailiff which the bailiff then relayed to the jury. It is impossible to determine, and no one remembers, what instructions were given and relayed to the jury."

On June 10, 1988, defendant filed an opening brief in this court raising several issues pertaining to the manner in which the trial court handled the December 16 inquiry. The Attorney General responded on the merits and also moved to augment the record on appeal, relying in part on a declaration from the prosecutor setting forth her recollection of the factual context surrounding the jury question. The declaration stated in essence that, although they failed to do so on the record, the parties had agreed that while Judge Lew was on vacation, jury questions would be relayed to him by telephone; his proposed response would be communicated to the attorneys by telephone and, absent any objection, would then be conveyed to the jury without requiring the presence of defendant or counsel. Relying on this unrecorded stipulation, respondent argued defendant had waived any lack of notice or defect in the proceedings.

On November 23, 1988, this court directed augmentation of the record concerning whether the parties had so stipulated and whether the trial court had notified counsel of its response to the jury's question on December 16. The matter returned to the superior court where Judge Reid assumed the task of resolving our concerns. On May 5, 1989, Judge Reid held a settlement hearing at which he considered the declarations of trial counsel and defendant's appellate counsel,[11] transcripts of previous proceedings, and the contents of the case file; counsel also testified. At the close of testimony and argument, Judge Reid stated he would "have a decision in printed form on May the 26th."

About May 20, Judge Reid contacted Judge Lew and asked him to review the court file to determine whether he might recall any pertinent facts. In a subsequent declaration, Judge Lew stated that an examination of the file had refreshed his recollection: Counsel had stipulated to a procedure for handling jury matters during his vacation. On December 16, 1985, he was contacted at home by his bailiff and told the jury had a question regarding one juror who could not choose between a guilty and a not guilty verdict. Judge Lew believed he instructed the bailiff to advise the jury to continue to deliberate

---

[11]In her subsequent statement, the prosecutor reiterated her earlier declaration and added that she had been contacted regarding the inquiry and informed the trial court proposed to instruct the jury to continue to deliberate. Defendant's two trial counsel either denied or could not recall entering into an off-the-record stipulation; neither had any recollection of being notified of the jury's inquiry or the court's response. Appellate defense counsel stated that when he spoke with the prosecutor, she admitted some lack of memory concerning the circumstances of the court's response.

until an answer was returned by the court and to have the clerk contact the attorneys to inform them of the inquiry. "Immediately" after the first call, he received a second call from the bailiff informing him the jury wished to continue to deliberate without receiving an answer. He thereupon instructed the bailiff to have the question placed in the file and have the jury continue to deliberate. Also at Judge Lew's direction, counsel were never contacted regarding the matter.

Neither the People nor the defense learned of the contact between Judge Reid and Judge Lew until so informed on May 26. Although Judge Reid had prepared a settled statement, he invited further input from the parties in light of Judge Lew's declaration. The defense objected to any consideration of the declaration as the product of an improper ex parte communication. The court overruled the objection and continued the matter to allow the parties to examine Judge Lew on the record, which they did. Judge Reid subsequently prepared an engrossed settled statement substantially in conformance with Judge Lew's declaration as reiterated in his testimony.

Defendant raises a succession of constitutional and statutory challenges, contending the foregoing facts establish a prejudicial violation of guaranties under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, analogous provisions of the state Constitution, and various statutory protections. (See, e.g., §§ 1127, 1138.) In addressing these claims, we note with some disquiet that both the trial and settled statement procedures reflect a certain inattention to the critical role of a proper and complete record in facilitating meaningful appellate review. We cannot urge too strongly that trial judges assiduously preserve a detailed account of all proceedings regardless of their perceived significance, particularly in capital cases, to minimize the need to reconstruct events. Nevertheless, while this practice was not always diligently observed here, we find that the lapses were neither singly nor cumulatively so substantial as to undermine confidence in the judgment; and any error was harmless beyond a reasonable doubt.

■ The fulcrum of defendant's numerous claims is his assertion that Judge Lew, through the medium of the bailiff, improperly instructed the jury ex parte and off the record in response to an indication they were deadlocked in their deliberations. A critical examination of the record fails to substantiate this broad characterization of the proceedings, which is based upon selective portions ostensibly favorable to defendant. A reviewing court must consider the entire record; it may not isolate certain particulars and disregard the totality of the circumstances.

The clerk's minutes of December 16 indicate, "The Bailiff calls Judge Lew at home and receives instructions which he relays to the jury." The

statement settled by Judge Reid, however, establishes much more: that the jury initiated an inquiry as to how to proceed if one member remained undecided; that Judge Lew intended to have them continue deliberating while he informed counsel of their question and formulated a response; that before receiving any reply, the jury determined they could benefit from further deliberations and so informed the bailiff, who relayed that information to the court; that on the court's instruction, the bailiff thereafter directed the jury to continue deliberating.

Defendant urges us to reject the settled statement in favor of the "more contemporaneous" clerk's minutes. In part, he argues that any reconstruction of the record more than three years after the occurrence is inherently unreliable due to the passage of time. Time alone, however, is not the dispositive consideration in evaluating whether a reconstructed record affords meaningful appellate review. The nature of the issue, the amount of the record reconstructed, and the means available to assist the process are all important in determining the reliability of any substitute for a contemporaneous verbatim account.

In the cases cited by defendant, court reporters' notes of significant portions of the proceedings were lost or destroyed and none of the original participants could sufficiently reconstruct pertinent events to formulate an accurate and complete settled statement to address the claims presented on appeal. (See, e.g., *In re Steven B.* (1979) 25 Cal.3d 1, 7 [157 Cal.Rptr. 510, 598 P.2d 480]; *People v. Apalatequi* (1978) 82 Cal.App.3d 970, 973 [147 Cal.Rptr. 473]; see also *People v. Serrato* (1965) 238 Cal.App.2d 112, 118-119 [47 Cal.Rptr. 543]; *Bergerco, U.S.A. v. Shipping Corp. of India, Inc.* (9th Cir. 1990) 896 F.2d 1210, 1213.) Under such circumstances, the appellant was deprived of " 'an adequate record to enable the court to pass upon the questions sought to be raised.' [Citation.]" (*In re Steven B., supra*, 25 Cal.3d at p. 7; see *People v. Jones* (1981) 125 Cal.App.3d 298, 301 [178 Cal.Rptr. 44].)

This case differs markedly: The issue is extremely narrow. The principal participant, Judge Lew, reviewed a substantial number of contemporaneous documents, which refreshed his recollection of the limited proceedings in question. Because defense counsel were not present during relevant events, their failure to contribute to the settled statement is both understandable and without significance to its reliability. We reject as unsupported speculation any suggestion counsel's inability to participate afforded Judge Lew and the prosecutor the opportunity to contrive the record against defendant. (Cf. *People v. Deere* (1991) 53 Cal.3d 705, 721 [280 Cal.Rptr. 424, 808 P.2d 1181] [whether anything took place off the record regarding appointment of

counsel and defense investigator "is purely a matter of speculation"].) All parties were examined under oath and assessed credible in their testimony by an impartial judicial officer unconnected to the trial proceedings. (See, *post*, fn. 12.) Under these circumstances, we perceive no violation of rights, constitutional or statutory, concerning settlement of the record or use of a settled statement on appeal.

Defendant also points to various inconsistencies between the settled statement and the clerk's minutes, in particular with respect to whether the bailiff provided instructions from Judge Lew in response to the jury's inquiry. Initially, we question defendant's premise that a conflict exists. The record contains no evidence the clerk used "instructions" as a term of art rather than simply as a synonym for "directions." (See Webster's New World Dict. (3d college ed. 1988) p. 700.) On the other hand, Judge Lew, who would clearly have understood the distinction, made no reference to giving the bailiff instructions, in any legal sense, to convey to the jury.

However, to the extent any material divergence does arise, "that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to the greater credence [citation]." (*In re Evans* (1945) 70 Cal.App.2d 213, 216 [160 P.2d 551].) This determination rests, in turn, upon "a consideration of the circumstances under which the proceedings were had. [Citations.]" (*People* v. *Washington* (1949) 95 Cal.App.2d 454, 456 [213 P.2d 70].) After careful review, we find the settled statement more reliable for the following reasons:

First, the court clerk was not a percipient witness to any of the relevant facts set forth in the minutes and relied entirely upon the bailiff's summary of events that took place in her absence. At the settled statement hearing, she had virtually no independent recollection and testified her minutes contained the most accurate information available. Judge Lew, whose declaration provided the substance of the settled statement, personally participated and recalled the circumstances from his review of contemporaneous notes and records. Second, the procedures described by Judge Lew are consistent with those he utilized with the approval of the defense in responding to earlier inquiries from the jury. Finally, the settled statement provides a more detailed and complete rendition of events based upon all available facts and circumstances. Having determined the settled statement is more creditworthy, we are bound by its contents, for "it has been held that the trial judge has full power over the record, and as long as he does not act arbitrarily, his

action is final. [Citations.]"[12] (*Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 376, fn. 1 [115 Cal.Rptr. 648, 525 P.2d 88]; see *Burns* v. *Brown* (1946) 27 Cal.2d 631, 636 [166 P.2d 1].)

■ In a related argument, defendant contends the absence of a reporter's transcript of the events of December 16 violated his rights under section 190.9, which provides that "all proceedings" in capital cases "shall be conducted on the record with a court reporter present." Without deciding whether the circumstances at issue constituted a "proceeding" within the meaning of section 190.9, we reject the implicit proposition that violation of the statute requires reversal of the conviction. (See *Draper* v. *Washington* (1963) 372 U.S. 487, 495 [90 L.Ed. 899, 905-806, 83 S.Ct. 774]; *March* v. *Municipal Court* (1972) 7 Cal.3d 422, 428 [102 Cal.Rptr. 597, 498 P.2d 437, 66 A.L.R.3d 945]; *People* v. *Chessman* (1950) 35 Cal.2d 455, 459-462 [218 P.2d 769, 19 A.L.R.2d 1084] [no right to new trial if reporter unable to prepare transcript].) "[W]here other methods of reconstructing the trial record are available, the defendant must proceed with those alternatives in order to obtain review. [Citations.]" (*People* v. *Jones, supra,* 125 Cal.App.3d at pp. 300-301; *In re Armstrong* (1981) 126 Cal.App.3d 565, 571 [178 Cal.Rptr. 902].) We find the record before us adequate to the task at hand: Resolution of defendant's claims does not depend upon a verbatim transcription; hence, the settled statement suffices. (See *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1116 [269 Cal.Rptr. 530, 790 P.2d 1327]; see also *People* v. *Pinholster* (1992) 1 Cal.4th 865, 921-922 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

---

[12]Defendant raises several other unmeritorious objections to the second settled statement. In particular, he attacks the communication between Judge Reid and Judge Lew. We do not condone any ex parte judicial contact with a potential witness. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1327-1328 [248 Cal.Rptr. 834, 756 P.2d 221].) However, "under the circumstances we cannot perceive how the court's action could have prejudicially affected the [proceeding]." (*People* v. *Deere, supra,* 53 Cal.3d at p. 722.) Judge Reid logically sought to fill an obvious evidentiary gap left by the parties. As in *People* v. *Deere, supra,* he apprised counsel of his communication prior to final action on the matter. He explained the limited and neutral nature of the communication and afforded both the prosecution and the defense the opportunity to question Judge Lew concerning the contents of his declaration and the circumstances under which he prepared it, including Judge Reid's inquiry. In denying defendant's disqualification motion, Judge Cox found no implication of bias or lack of impartiality motivating or resulting from the contact; nor does any present itself to this court.

Defendant also contends that in giving his rendition of events, Judge Lew was biased in favor of avoiding any implication of error or misconduct. Unlike most situations, however, the trial judge did not settle the record of proceedings over which he presided, with ultimate control over its contents. (Cf. *People* v. *Jenkins* (1963) 223 Cal.App.2d 537, 540 [35 Cal.Rptr. 776] [trial judge "was in the untenable position of either believing his own affidavit or rejecting it in preference to another, thus ruling his own evidence untrustworthy"].) On the contrary, Judge Lew was a witness at the settled statement hearing, subject to examination by the parties to test his recollection and assess his credibility. On that basis a different judge, not involved in the original trial proceedings, determined the facts. Whatever prejudicial potential might otherwise arise, these circumstances negated the possibility here.

On this basis, we also find no violation of defendant's due process right to meaningful appellate review. (*Rushen* v. *Spain* (1983) 464 U.S. 114, 120 [78 L.Ed.2d 267, 274, 104 S.Ct. 453].)

■ In a similar vein, defendant argues that in the absence of a reporter's transcript of the bailiff's communications with the jury, we cannot determine whether his directions conveyed a prejudicially coercive connotation. At the outset, we reject defendant's factual predicate. Bailiffs have innumerable contacts with deliberating juries any of which offers the opportunity for an untoward comment. The mere potential for impropriety, however, cannot sustain an inference of misconduct. As officers of the court, bailiffs must be presumed to act in accordance with their sworn duty to keep the jury insulated from all extraneous influences, including their own. (Evid. Code, § 664; see *People* v. *Napolitano* (1959) 175 Cal.App.2d 477, 480 [346 P.2d 238]; cf. *Rushen* v. *Spain, supra,* 464 U.S. at pp. 118-119 [78 L.Ed.2d at pp. 273-274].)

Moreover, in this particular case, the record reasonably supports the conclusion the bailiff told the jury nothing more or less than to continue their deliberations, as they were already doing. We have no evidence the jurors had deadlocked (cf. § 1140 [court may declare mistrial when "it satisfactorily appears that there is no reasonable probability that the jury can agree"]) or had reached an impasse they would likely resolve other than in accordance with their individual judgment. (See, e.g., *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73] [disapproving *Allen*-type instructions as coercive of minority jurors].) Indeed, it is far from clear that any actual "disagreement" existed, only that one juror had yet to decide whether the prosecution had proven guilt beyond a reasonable doubt. The situation was thus anything but rife with the potential for undue or untoward influence by virtue of ex parte contact. (See, e.g., *United States* v. *United States Gypsum Co.* (1978) 438 U.S. 422, 460 [57 L.Ed.2d 854, 883-884, 98 S.Ct. 2864]; *Burton* v. *United States* (1905) 196 U.S. 283, 307 [49 L.Ed. 482, 490-491, 25 S.Ct. 243]; *People* v. *Lozano* (1987) 192 Cal.App.3d 618, 625 [237 Cal.Rptr. 612].) Given the minimal nature of the message, the possible nuances of language and tone are too limited to raise any constitutional concern.

■ Turning to defendant's remaining arguments, i.e., that the manner and nature of the trial court's response to the jury's inquiry violated his right to counsel, his right to be present at all trial proceedings, his right to a reliable verdict, his due process right to a fair trial, and related statutory

provisions, we find the record sustains none of these claims.[13] At most, the court neglected to memorialize an essentially ministerial exchange in which the bailiff had an incidental contact with the jury to inform them, at the court's behest, to continue deliberating as they had already independently decided to do. Under these circumstances, "nothing which assertedly occurred off the record here could possibly have affected the verdict."[14] (*People* v. *Deere, supra,* 53 Cal.3d at p. 720.)

Contrary to defendant's assertions, we do not confront a situation in which the trial court erroneously gave the jury additional substantive instructions. In *People* v. *Weatherford, supra,* 27 Cal.2d 401, the trial judge, through the bailiff and in the absence of defendant's attorney, responded to an inquiry " 'Whether or not it was the duty of the prosecution or the defense to put the defendant on the scene.' " (*Id.,* at p. 417.) The court's reply as well as the bailiff's additional colloquy with the jury was apparently "interpreted as meaning that the matter was none of the jury's business." (*Id.,* at p. 419.) In *People* v. *Lozano, supra,* 192 Cal.App.3d 618, "the trial judge gave a self-defense instruction without notifying defense counsel or otherwise affording him an opportunity to object to the instruction before it was given." (*Id.,* at p. 622.) Similarly, in *People* v. *Dagnino* (1978) 80 Cal.App.3d 981 [146 Cal.Rptr. 129], the court gave the jury additional instructions on the difference between first and second degree burglary and the definition of accessory and also provided them with a written copy of all instructions without informing counsel or permitting any response. (*Id.,* at pp. 985-986; see also *People* v. *Jenkins, supra,* 223 Cal.App.2d at pp. 539-540.)

In each circumstance, counsel could have taken some action on the defendant's behalf to amplify, clarify, or modify the supplemental instruction or procedure. (See also *People* v. *Hogan, supra,* 31 Cal.3d at p. 850;

---

[13]In light of our analysis, we need not address any arguments relating to whether defendant waived his claims on appeal by virtue of an unrecorded stipulation to the procedures utilized by the trial court. Defense counsel were not contacted at any time concerning the jury's note; therefore, whatever off-the-record agreement the court might otherwise have invoked, it did not do so on this occasion. More importantly, as we explain, nothing of any constitutional or statutory significance took place. Thus, even if we assume defense counsel did not acquiesce in advance, defendant incurred no prejudice.

[14]The standard of review in assessing the impact of an improper communication between the court and a deliberating jury is not clear. In *People* v. *Weatherford* (1945) 27 Cal.2d 401, 418 [164 P.2d 753], we applied a "miscarriage of justice" standard. (See also *People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432 [193 Cal.Rptr. 711].) We have also invoked the "harmless beyond a reasonable doubt" test on the theory that the ex parte communication denied the defendant the right to have counsel present at all critical stages of the proceedings. (See *People* v. *Hogan* (1982) 31 Cal.3d 815, 849-850 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another point in *People* v. *Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]; see also *People* v. *Lozano, supra,* 192 Cal.App.3d at p. 624; *People* v. *Knighten* (1980) 105 Cal.App.3d 128, 133 [164 Cal.Rptr. 96].) We need not resolve the question here since we do not find prejudice under either standard.

*United States* v. *Dellinger* (9th Cir. 1972) 472 F.2d 340, 380.) The court's failure to give notice or afford an opportunity to respond thus constituted statutory as well as constitutional error. ■ "Penal Code section 1138 requires that any questions posed by the jury regarding the law or the evidence be answered in open court in the presence of the accused and his or her counsel, unless presence is 'waived. Communication between judge and jury during deliberations without affording defendant and counsel an opportunity to be present impinges on a defendant's constitutional right to the assistance of counsel. [Citations.]" (*People* v. *Chagolla, supra,* 144 Cal.App.3d at p. 432; see also § 1127 ["All instructions given shall be in writing" unless preserved by court reporter].) Ex parte instructions also implicate the defendant's right to personal presence at all trial proceedings. (See U.S. Const., Amend. VI; § 1043, subd. (a).)

■ Here, however, the court did not direct the jury on any question "regarding the law or the evidence"; and the circumstances more closely parallel those found nonprejudicial in *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627]. In that case, the jury sent the court a note inquiring, "'May we render a decision of life imprisonment *and not eligible for parole*?' . . . ." (*Id.,* at p. 188.) The court responded, "'No'"; and the defendant claimed reversible error "because of this communication between the judge and jury out of the presence of the defendant and his counsel." (*Id.,* at p. 189.) We acknowledged "that courts are practically unanimous in holding that private communications between court and jury are improper, and that all communications should be made in open court. [Citation.] Ordinary procedure would require that the trial judge afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be deemed irregular. But in this instance the court could not have responded by any other answer than 'No' or its equivalent, namely, that the jury was to be guided solely by the instructions already given. The answer of the trial judge could properly have been made over the objection of the defendant or his counsel if the ordinary procedure had been followed. The episode may not be deemed to be prejudicial . . . ." (*Ibid.; People* v. *Jennings* (1991) 53 Cal.3d 334, 384 [279 Cal.Rptr. 780, 807 P.2d 1009].)

We apply a similar analysis and reach a similar conclusion in this case. While we strongly reiterate the proscription against "private communications between court and jury," we do not infer from either the fact of the communication or the absence of a contemporaneous verbatim record that a prejudicial contact occurred. To the contrary, considering the totality of the circumstances, we conclude defendant did not suffer an impairment of rights sufficient to affect the verdict. (See *United States* v. *Di Pietto* (7th Cir. 1968)

396 F.2d 283, 287.) As an interim measure, the court reasonably directed the bailiff to have the jury maintain the status quo pending notification of counsel and their agreement to any further instructions. (See *United States* v. *Dellinger, supra*, 472 F.2d at p. 378 ["Messages, conveyed through a [bailiff], that the jury should continue deliberations, have been held harmless error."]; cf. *People* v. *Lee* (1974) 38 Cal.App.3d 749, 756 [113 Cal.Rptr. 641] ["during a reasonable delay in obtaining evidence which it wishes to consider, the jury may continue its deliberations and reach a valid verdict without the evidence it has previously requested"]; *People* v. *Stafford* (1973) 29 Cal.App.3d 940, 943-945 [10 Cal.Rptr. 72] [same].) Once the jury expressed a desire and intent to continue deliberations without a reply, the court had only one reasonable response: "Keep deliberating." At no point could counsel have objected to or offered any qualification of the court's action.[15] (See *People* v. *Jennings, supra*, 53 Cal.3d at pp. 384-385 [court correctly replied to informal inquiry regarding procedure if jury deadlocked]; *People* v. *Woods* (1950) 35 Cal.2d 504, 512 [218 P.2d 981] [court correctly explained "hung jury"].)

Our recent decision in *People* v. *Mickle* (1991) 54 Cal.3d 140 [284 Cal.Rptr. 511, 814 P.2d 290] is also instructive. In that case, the jury sent the court a note shortly after beginning deliberations asking for " 'a summarized definition of the charges of murder. First Degree, Second Degree.' " (*Id.*, at p. 174.) "In the presence of the court clerk and reporter, but without notifying counsel," the court returned a written response: " 'If you wish to be brought back into court, I will reread the information to you.' The jury never responded to the court's offer." (*Ibid.*, italics deleted.) Defendant Mickle made similar claims of error, all of which we rejected: "While the preferable practice is to notify counsel of all mid-deliberation jury inquiries, the trial court did not err here. A statutory or constitutional violation occurs only where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel. [Citations.] Here, the court simply offered to provide further instructions in open court, presumably after proper notice to counsel. The offer was not accepted, and no murder instructions were actually given after the jury retired to deliberate." (*Ibid.*; see *Rushen* v. *Spain, supra*, 464 U.S. at p. 121 [78 L.Ed.2d at pp. 274-275].)

In sum, although we conclude the trial court erred in failing to observe the general proscription against ex parte communications with a deliberating jury, we cannot deem such error ground for reversal. "[I]t is most undesirable that anything should reach a jury which does not do so in the court

[15]Since we thus find no violation of defendant's guaranty of counsel, we reject his related argument that the trial court's actions infringed his constitutional or statutory right to personal presence at all critical stages of the proceedings.

room. This is, indeed, too well settled for debate. [Citations.] But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity. [Citations.] There cannot be the slightest doubt here that the informality—for, at most, it was no more—did not prejudice the accused."[16] (*United States* v. *Campagna* (2d Cir. 1945) 146 F.2d 524, 528; accord, *People* v. *Alcalde, supra*, 24 Cal.2d at p. 189; *United States* v. *Di Pietto, supra*, 396 F.2d at p. 287; *United States* v. *Grosso* (3d Cir. 1966) 358 F.2d 154, 157-158, revd. on other grounds *sub nom. Grosso* v. *United States* (1968) 390 U.S. 62 [19 L.Ed.2d 906, 88 S.Ct. 709].)

D. *Instructions.*

1. *Presumption of innocence.*

 Defendant contends the court erred in failing to direct the jury not to consider the fact of his arrest, charge, or presence at trial in assessing his guilt and not to be influenced by sympathy, passion, prejudice, or the like. [17] (See CALJIC No. 1.00.)[18] His argument attempts to inflate the omission to constitutional proportions, claiming the defect violated his due process right to the presumption of innocence.[19] (*Taylor* v. *Kentucky, supra*, 436 U.S. 478.)

---

[16]Accordingly, we conclude defendant suffered no impairment of his right to a public trial by an impartial jury. We also find the jury's determination reliable under the Eighth Amendment of the federal Constitution. Since defendant was not arbitrarily denied any statutory right, he was not denied due process. (See *Beck* v. *Alabama* (1980) 447 U.S. 625, 638 [65 L.Ed.2d 392, 403, 100 S.Ct. 2382].) We similarly reject defendant's claims under analogous provisions of the California Constitution.

[17]Apparently, the court inadvertently omitted to give the second page of instructions contained in CALJIC No. 1.00. Neither party noted the omission at the time or requested a supplemental instruction.

[18]The entire omitted portion of CALJIC No. 1.00 reads as follows:

"As jurors you must not be influenced by pity for the defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial. None of these circumstances is evidence of his guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent.

"You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, or public opinion or feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

[19]Defendant characterizes the deficiency as an impingement on the presumption of innocence. Under his analysis, however, the issue appears more properly framed as one relating to the prosecution's burden of proof. "It is now generally recognized that the 'presumption of innocence' is an inaccurate, shorthand description of the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and

We decline to characterize CALJIC No. 1.00 so extravagantly. In *Taylor* v. *Kentucky, supra*, 436 U.S. 478, the trial court refused *any* instruction on the presumption of innocence, giving only the standard charge that the prosecution must prove guilt beyond a reasonable doubt. In reversing the conviction, the United States Supreme Court explained that while the two concepts are "logically similar, the ordinary citizen may well draw significant additional guidance from an instruction on the presumption of innocence." (*Id.*, at p. 484 [56 L.Ed.2d at p. 474].) Constitutional jurisprudence has long recognized the latter as one way of impressing upon the jury the importance of the right to have one's guilt "determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. [Citation.]" (*Id.*, at p. 485 [56 L.Ed.2d at pp. 474-475].)

Nevertheless, due process does not mandate the "use of the particular phrase 'presumption of innocence'—or any other form of words . . . ." (*Taylor* v. *Kentucky, supra*, 436 U.S. at p. 485 [56 L.Ed.2d at pp. 474-475]; see *id.*, at p. 488, fn. 16 [56 L.Ed.2d at pp. 476-477].) Rather, this traditional formulation "simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial." (*Id.*, at p. 486 [56 L.Ed.2d at pp. 475-476], fn. omitted.) Accordingly, we decline defendant's implicit invitation to confine instruction on the presumption of innocence to any rigid or narrowly precise terms. (See *id.*, at p. 487, fn. 16 [56 L.Ed.2d at p. 476].) As long as the court's charge to the jury conveys the substance of the principle, it will satisfy due process.

The record here meets the standard of *Taylor* v. *Kentucky, supra*, 436 U.S. 478: the jury was fully apprised of its responsibility to adjudicate guilt on the evidence presented in court rather than on the basis of extraneous considerations. At the outset of the proceedings, the court admonished prospective jurors the information did not constitute evidence of guilt and they should not draw any adverse inference from the fact of defendant's arrest; nor should they be influenced by sympathy, passion, prejudice, or public feeling. The introductory guilt phase instructions directed the jury to "determine the facts of the case from the evidence received in the trial and not from any

effected persuasion; *i.e.*, to say in this case, as in any other, that the opponent of a claim or charge is presumed not to be guilty is to say in another form that the proponent of the claim or charge must evidence it.' [Citation.]" (*Taylor* v. *Kentucky* (1978) 436 U.S. 478, 483-484, fn. 12 [56 L.Ed.2d 468, 473-474, 98 S.Ct. 1930].)

Defendant does not contend the instructional gap required him to come forward with evidence of his innocence; rather, it assertedly lessened the prosecution's burden of proof by allowing the jury to consider matters extraneous to a proper determination of his guilt. In light of our conclusion, the failure to make the analytical distinction is of no consequence in this case.

other source." (CALJIC No. 1.00.) The jury also received the full panoply of instructions regarding the presumption of innocence, the measure of reasonable doubt, and the prosecutor's burden of proof.[20] (CALJIC Nos. 2.90 & 2.91; see also §§ 1096, 1096a.) Accordingly, we reject the contention that the omitted instruction impinged the constitutional guaranty of due process.[21]

Moreover, while we agree the trial court should have given the complete text of CALJIC No. 1.00 as a precautionary reminder that the jury focus their attention on the evidence in resolving defendant's fate, the lapse was not prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People* v. *Duncan* (1991) 53 Cal.3d 955, 972 [281 Cal.Rptr. 273, 810 P.2d 131].) Although the case involved senseless violence and criminal conduct of the most serious order, the circumstances did not particularly invite or encourage a consideration of subjective matters outside the evidence. Like defendant, the victims were adult males who had at least some connection with gang activity, a fact tending to temper rather than arouse the sense of outrage that might be engendered by the death of a child or similarly innocent bystander caught in the cross-fire of gang warfare. Nor did the prosecutor's argument seek to exploit the types of concerns implicated by the omitted admonition. Thus, we find no danger the jury may have been misled from their proper deliberative course.[22]

### 2. *Failure to reiterate applicable guilt phase instructions.*

Defendant alleges a violation of various federal and state constitutional rights because at the penalty phase the trial court failed to reiterate certain general instructions given at the guilt phase concerning evaluation of the evidence. (CALJIC Nos. 1.02 [statements of counsel not evidence], 2.20 [credibility of witnesses], 2.22 [weighing conflicting testimony], 2.27 [evaluating testimony of single witness], 2.80 [expert witness testimony].)

As in past cases, "we question whether there was error. Having heard nothing to contradict the earlier instructions on evaluating witnesses' credibility, etc., we believe a reasonable jury would correctly assume those

---

[20]The court also gave numerous other instructions that touched incidentally but specifically on the necessity of proof beyond a reasonable doubt and related matters. (See CALJIC Nos. 2.01, 8.71, 8.80, 17.10, 17.40.)

[21]To the extent we find no violation of rights under the federal Constitution, we reach a similar conclusion as to analogous provisions of our state charter.

[22]On several occasions, the jury requested the rereading of various witnesses' testimony, including defendant's. This fact as well suggests they fully understood their obligation to base their decision on the evidence and not any of the extraneous factors contained in the omitted portion of CALJIC No. 1.00.

'generic' instructions continued to apply. [Citation.]" (*People* v. *Brown* (1988) 46 Cal.3d 432, 460 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 600 [280 Cal.Rptr. 631, 809 P.2d 290].) We are unpersuaded that the lapse of time between the guilt and penalty phases impaired the jurors' memories or otherwise undermined the reliability of their deliberations. The jurors did not merely hear the instructions in a vacuum; presumably, they utilized them as directed in determining defendant's guilt and thereby developed a sufficient awareness of their relation to the deliberative process. "In any event, even if error occurred, we cannot imagine this amounted to reversible prejudice in this case." (*People* v. *Brown*, *supra*, 46 Cal.3d at p. 460.)

### 3. *Individualized judgment of each juror.*

 The trial court also failed to repeat the guilt phase instruction that both parties were "entitled to the individual opinion of each juror." (CALJIC No. 17.40.) Defendant contends the omission created an unacceptable risk the jury would improperly make its penalty determination on a "majority rule" basis. (See *Mills* v. *Maryland* (1988) 486 U.S. 367 [100 L.Ed.2d 384, 108 S.Ct. 1860].)

As previously explained, we do not regard such oversight as error, particularly since other instructions informed the panel "each juror is free to assign whatever moral or sympathetic value that the juror deems appropriate to each and all of the [aggravating and mitigating] factors on which you have been instructed." (CALJIC No. 8.84.1 (4th ed. 1984).) The court also told the jury, "To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.84.2 (4th ed. 1984).)

In light of these specific directions, the omission of the more general one raises none of the concerns expressed in *Mills* v. *Maryland*, *supra*, 486 U.S. 367. In that case, the United States Supreme Court concluded that a reasonable jury might interpret portions of Maryland's capital sentencing instructions and verdict form to preclude consideration of mitigating evidence unless they unanimously agreed the defendant had met his burden of proof, thereby requiring imposition of the death penalty even though at least one juror found the aggravating circumstances less than compelling when weighed against those in mitigation. (*Id.*, at pp. 377-380 [100 L.Ed.2d at pp. 395-397].) Moreover, "[a] jury following the instructions set out in the verdict form could be 'precluded from considering, *as a mitigating factor,* [an] aspect of a defendant's character or record [or a] circumstanc[e] of the

offense that the defendant proffer[ed] as a basis for a sentence less than death,' [citation], if even a single juror adhered to the view that such a factor should not be so considered." (*Id.*, at p. 380 [100 L.Ed.2d at p. 397].)

We find no reasonable likelihood that the jury in defendant's case similarly misinterpreted the instructions and failed to accord him the benefit of a fully individualized evaluation of the aggravating and mitigating evidence presented.

 4. *Failure to instruct jury to assume death penalty will be carried out.*

■ Finally, defendant contends the trial court had a sua sponte obligation to instruct the jury it must assume that, if imposed, the death penalty will be carried out. According to defendant, because of a commonly held misconception to the contrary, jurors will not appreciate the actual consequences of their sentencing choice, thereby undermining the reliability of the verdict.

We find no error. First, the record discloses no factual substantiation of defendant's premise. (Cf. *People* v. *Cox* (1991) 53 Cal.3d 618, 681 [280 Cal.Rptr. 692, 809 P.2d 351] ["nothing in the record supports the claim of a 'commonplace misunderstanding' that life prisoners are arbitrarily and capriciously released from confinement"].) In *People* v. *Cox, supra*, 53 Cal.3d at page 696, we observed that in February 1986 "few citizens of the state could have been unaware" of the "strenuous and well publicized campaign" to unseat Chief Justice Bird and two associate justices, which "coalesced around the high percentage of death penalty reversals and the claim that . . . this court was intentionally evading the law in refusing to affirm more of those decisions and allow executions to recommence." These comments, which arose in the context of alleged juror misconduct, can hardly serve as empirical support for the proposition that there exists a widespread misperception among penalty phase jurors that "death" means anything other than eventual execution of the defendant.[23] Moreover, we impliedly concluded that discussion of such matters would not reasonably undermine the jury's sense of the gravity of its task.

[23]Several significant factors distinguish *Bruce* v. *State* (1990) 318 Md. 706 [569 A.2d 1254], on which defendant also relies. In that case, the Maryland Supreme Court concluded that absent further explanation from the trial court, a jury would not know that a person sentenced to life imprisonment without the possibility of parole would never be released from confinement. "It is universally recognized that the literal words of a sentence to imprisonment are generally not an accurate indication of the effect of the sentence." (*Id.*, 569 A.2d at pp. 1268-1269.)

We are unpersuaded the comments cited by defendant have any relevance to this case. First, the court obviously was not addressing the question of whether jurors are potentially

Second, and more importantly, defendant's contention is legally untenable. In *People* v. *Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], the trial court refused to instruct the jury "that if your decision in the penalty phase of this trial, is that the defendant should be put to death, the sentence will be carried out." (*Id.*, at p. 129.) We rejected the defendant's claim of error, concluding, "It is as incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out as it is to suggest they need not take their responsibility as seriously because the ultimate determination of penalty rests elsewhere." (*Id.*, at p. 130.) Such an instruction is simply "not accurate. It ignores the power of the superior court to reduce a sentence of death on review under section 190.4, subdivision (e). It ignores the Governor's power of commutation." (*Ibid.*) Since a court may refuse an instruction that misstates the law, it obviously has no sua sponte duty to misguide the jury.

Finally, we discern no evidence that defendant's jury actually experienced any confusion. The arguments of counsel highlighted the significance of the choice between life and death. Neither side suggested the jury's decision was merely an academic exercise with only theoretical consequences. Nor did the jury itself request clarification. (Cf. *People* v. *Gordon, supra,* 50 Cal.3d at p. 1277 [jury did not seek amplification of meaning of life imprisonment without possibility of parole].) On this basis as well, the trial court had no reason to infer any misunderstanding and spontaneously interpose a further admonition on the subject.

E. *Jury's consideration of unadjudicated criminal activity.*

The prosecution introduced the testimony of several witnesses to assaultive conduct by defendant, which it offered in aggravation of sentence under section 190.3, factor (b). Although defendant contends the admission of evidence of these prior unadjudicated crimes violated his rights under the state and federal Constitutions, he also acknowledges we have consistently rejected similar claims of error. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People* v. *Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282], and cases cited therein.) We are unpersuaded of any need to reevaluate our original conclusions.

---

confused whether a death sentence means exactly that. "Death" is not a legal term of art that anticipates some compromise in its actual execution. Second, in *Bruce* v. *State, supra,* 569 A.2d 1254, the defendant requested an appropriate clarifying instruction; the issue thus did not involve any sua sponte duty. (*Id.*, at p. 1268.) Finally, under Maryland law, "the defense is entitled to have the jury consider as a mitigating factor evidence concerning eligibility for parole in the event a life sentence was imposed. [Citation.]" (*Ibid.*) California's statutory scheme clearly forecloses such consideration. (See *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1277 [270 Cal.Rptr. 451, 792 P.2d 251].)

In *People* v. *Medina, supra,* 51 Cal.3d 870, as here, the defendant argued that the jury that adjudicated his guilt could not be fair and unbiased in evaluating evidence of other uncharged crimes, that such evidence is inherently prejudicial, that the jury cannot realistically disregard other crimes evidence not proven beyond a reasonable doubt, that other jurisdictions have adopted a contrary rule, and that equal protection requires application of the same procedural rules, including jury unanimity, as those available to defendants prosecuted separately for such other crimes. (*Id.,* at p. 907.) As we explained, "Contrary to defendant's assumptions, we think *Balderas* and its progeny adequately considered and rejected the foregoing arguments. As *Balderas* observes, each of these contentions is overshadowed by the state's legitimate interest in prosecuting capital cases before a single jury, and in allowing that jury to weigh and consider the defendant's prior criminal conduct in determining penalty, so long as reasonable steps are taken to assure the defendant a fair and impartial penalty trial. [Citation.] We decline to reconsider that rationale here." (*Ibid.*)

F. *Defendant's age as factor in aggravation.*

■■■ During the penalty phase argument, the prosecutor urged the jury to consider defendant's age, 22 at the time of the murders, as a factor in aggravation "given his background and that he was very street smart by that time and that he was not a kid." Although the record reflects no contemporaneous objection, defendant now contends age can only function as a factor in mitigation and the court should have so instructed the jury.

We have heretofore definitively construed section 190.3, factor (i), and remain convinced of our original rationale: "The word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Cox, supra,* 53 Cal.3d at pp. 674-675.) "It is up to the jury to decide. That is the nature of the adversarial process." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 844 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 785 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Cases cited by defendant in which 22-year-old offenders were found deserving of some leniency because of their age simply illustrate that the relative significance of this factor necessarily varies with the individual and the circumstances of the particular offense. (Cf. *People* v. *Dillon* (1983) 34 Cal.3d 441, 488 [194 Cal.Rptr. 390, 668 P.2d 697] [in felony-murder case "ample evidence [existed] that because of his immaturity [defendant] neither foresaw the risk he was creating nor

was able to extricate himself without panicking"].) Moreover, in some cases, statutory restrictions limited consideration of age to mitigation only.[24] (E.g., *Hudson* v. *State* (Fla. 1989) 538 So.2d 829, 831, fn. 5.)

Recent decisions of the United States Supreme Court do not compel a contrary conclusion. In *Thompson* v. *Oklahoma* (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687], the court did not address the question of age as a sentencing factor in capital crimes. Rather, it held that the federal Eighth Amendment prohibition against cruel and unusual punishment precluded execution of a person who was under 16 years of age at the time of his or her offense. (*Id.*, at pp. 821-838.) Whatever theoretical relevance this holding may have to our present consideration, we do not find it inconsistent with our construction of section 190.3, factor (i).[25]

In *Stanford* v. *Kentucky, supra,* 492 U.S. 361, the high court reached the opposite conclusion with respect to the execution of individuals who were 16 or 17 at the time of their crimes. (*Id.*, at p. 380 [106 L.Ed.2d at pp. 324-325].) In drawing a distinction between laws that precluded persons under 18 from engaging in various activities such as driving, drinking alcohol, and voting and those that permitted their capital punishment, the high court noted that the latter determination is individualized and that "one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age [citation]." (*Id.*, at p. 375 [106 L.Ed.2d at 321-322].) While we do not quarrel with this imperative, neither do we infer a constitutional limitation on the sentencing calculus.[26] While the jury must be allowed to consider all relevant mitigating evidence including age (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 608 [57 L.Ed.2d 973, 992, 98 S.Ct. 2954]),

---

[24]Defendant suggests there is a "national consensus" that age is strictly mitigating. (See, e.g., Neb. Rev. Stat. § 29-2523(2)(d) (1989); N.H. Rev. Stat. Ann. § 630:5(VI)(d) (1991 Supp.); N.C. Gen. Stat. § 15A-2000(f )(7) (1988); 42 Pa. Cons. Stat. § 9711(E)(4) (1982); see also *Stanford* v. *Kentucky* (1989) 492 U.S. 361, 375, fn. 5 [106 L.Ed.2d 306, 321-322, 109 S.Ct. 2969].) The fact that other jurisdictions have chosen to impose such a limitation does not generate a constitutional compulsion to interpret this state's statutory provisions to the same effect, however. As long as a sentencing scheme meets the fundamental prerequisites of reliability and rationally guided, individualized discretion, the United States Supreme Court has left formulation of the particulars to the wisdom of each state's Legislature. (See, e.g., *Zant* v. *Stephens* (1982) 462 U.S. 862, 874-880 [77 L.Ed.2d 235, 248-252, 103 S.Ct. 2733]; see also *California* v. *Brown* (1987) 479 U.S. 538, 540, fn. * [93 L.Ed.2d 934, 939, 107 S.Ct. 837].)

[25]As the holding may suggest, the high court focused its analysis upon the relationship between adolescence and criminal culpability, noting that "[i]nexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult." (*Id.*, at p. 835.) This rationale obviously becomes less tenable as one grows into adulthood.

[26]In a footnote to this portion of its discussion, the Supreme Court cites section 190.3, factor (i), in a listing of state statutes "specifically designating the defendant's age as a mitigating factor in capital cases." (*Id.*, at p. 375 [106 L.Ed.2d at 321-322], fn. omitted.)

no rationale precludes its consideration as an aggravating factor under proper circumstances. (See, e.g., *California* v. *Ramos* (1983) 463 U.S. 992 at pp. 999-1000 [77 L.Ed.2d at pp. 1179-1180, 103 S.Ct. 3446].)

In *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190], the court similarly cited "youth" as among the "mitigating evidence" available for the jury's evaluation under section 190.3. (*Id.*, at p. 383 [108 L.Ed.2d at p. 331].) This reference, however, does not speak to the question of whether age can operate *solely* in favor of leniency; it simply implies that it should when appropriate. (See, *ante*, fn. 24.) Here, the prosecutor argued only that the facts did not so warrant.

Finally, defendant cites *Stringer* v. *Black* (1992) 503 U.S. __, __-__ [117 L.Ed.2d 367, 377-383, 112 S.Ct. 1130, 1135-1140] in support of his contention that the age factor set forth in the standard penalty phase instructions is vague, thereby inviting arbitrary and capricious sentencing results in violation of the Eighth Amendment. Reversal on this ground is subject to a harmless error analysis. (*Id.* at 503 U.S. pp. __, __ [117 L.Ed.2d at pp. 379, 382-383, 112 S.Ct. at pp. 1137, 1140].) Even assuming the age factor to be constitutionally infirm as contended, on the record before us we find no prejudice.

### G. *Cumulative error.*

Defendant has sustained virtually none of his claims of error. Accordingly, we find no cumulative deficiency in the trial proceedings sufficient to support reversal on that basis. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 1006 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

### H. *Constitutionality of death penalty statute.*

Defendant raises numerous miscellaneous claims that California's death penalty statute fails to meet constitutional muster. We have previously rejected these contentions and discern no reason on the present record to reconsider our conclusions. (See *People* v. *Cox, supra*, 53 Cal.3d at p. 692.)

The federal Constitution does not require the jury to find beyond a reasonable doubt that the prosecution proved each aggravating factor, that the circumstances in aggravation outweigh those in mitigation, or that death is the appropriate penalty. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" (*id.*, at p. 779) and, hence, not susceptible to a burden-of-proof quantification.

---

Contrary to defendant's urging, we do not construe this citation as sufficient to restrict consideration of factor (i) evidence solely to mitigation. Unless and until the high court directly addresses the constitutionality of factor (i) as delineated by this court, its obiter characterization remains just that.

Similarly, we find no basis for requiring the exclusion of nonstatutory unspecified aggravating factors, jury unanimity as to aggravating factors, or appellate proportionality review. (*People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 777-779.) Moreover, the same rationale obtains regardless of the constitutional perspective; the mandate of reliability under the Eighth Amendment is sufficiently exacting to satisfy the demands of due process.[27]

## I. *Motion for modification of penalty.*

 Pursuant to its obligation under section 190.4, subdivision (e), the trial court reviewed the evidence on which the jury based its penalty determination. The court found the verdict supported by the record and further stated its finding "that there were no factors in mitigation." Defendant contends that because he presented evidence of his low intelligence and learning difficulties, the court's statement implies a failure to weigh all relevant circumstances in assessing the proper penalty.

When viewed in context, the record establishes that the court did consider all pertinent penalty phase evidence, including testimony about defendant's below average intelligence and problems in school. His real complaint appears directed to the weight assigned this factor, which the court evidently found "insufficient to vitiate the jury's penalty determination." (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1251 [283 Cal.Rptr. 144, 812 P.2d 163].) This court, however, may not interpose or substitute its conclusion as to the relative balance of aggravating and mitigating circumstances for that of the trier of fact. Our inquiry must end with the finding that all constitutional and statutory considerations have been observed.

### DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied January 27, 1993, and the opinion was modified to read as printed above.

---

[27]Defendant also cites the equal protection guarantee in support of his burden of proof claims. He fails, however, to articulate any specific comparison with a similarly situated class of defendants benefitting from a more favorable standard of proof at sentencing.