Filed 2/2/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B329296 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA484297) |
| v. | |
| JAMES MASON HEAPS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge. Reversed and remanded.

Alan S. Yockelson and John M. Bishop for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Justice Black put it simply in *Gideon v. Wainwright* (1963) 372 U.S. 335, in holding the Sixth Amendment's right to counsel applies in state criminal trials: "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours." (*Id.* at p. 344.) Our high court warned that right is impinged when a judge communicates with a jury during deliberations "without affording defendant and counsel an opportunity to be present . . . . [Citations.]' [Citations.]" (*People v. Hawthorne* (1992) 4 Cal.4th 43, 69 (*Hawthorne*).) That is what happened here.

Twice, the trial court, Judge Michael Carter presiding (the trial judge), sent the judicial assistant, Luis Corrales (the JA), into the jury room to speak to the jury about the foreperson's (Juror No. 4's) note describing the jurors' collective concern that a juror (Juror No. 15) did not speak English sufficiently to deliberate and had already made up his mind (the Note). The JA spoke to the jury in English, and at the request of Juror No. 15, in Spanish. At no time did the trial judge inquire of the jury or inform trial counsel of the Note's existence. The JA's conversations about the Note with the jury were not transcribed.

Respondent concedes the trial court's handling of the Note deprived defendant of his constitutional right to counsel at a critical stage of his trial. Respondent also concedes it has the burden to prove, beyond a reasonable doubt, the absence of prejudice from this constitutional error.

We conclude respondent fails to satisfy its burden to demonstrate, beyond a reasonable doubt, that the deprivation of counsel at a critical stage in the proceedings was not prejudicial. We thus reverse the judgment and remand for a new trial.

# BACKGROUND

We summarize below only those facts relevant to the dispositive issue on appeal.

## 1.   *The charges and jury findings*

Defendant James Mason Heaps worked as a gynecological oncologist at the University of California Los Angeles.  His trial involved the claims of seven former patients for one or more of the following crimes during his medical examinations:  sexual battery by fraud,[1] sexual exploitation,[2] and sexual penetration of

---

[1]  Penal Code section 243.4, subdivision (c) provides:  "Any person who touches an intimate part of another person for the purpose of sexual arousal, sexual gratification, or sexual abuse, and the victim is at the time unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose, is guilty of sexual battery.  A violation of this subdivision is punishable by imprisonment in a county jail for not more than one year, and by a fine not exceeding two thousand dollars ($2,000); or by imprisonment in the state prison for two, three, or four years, and by a fine not exceeding ten thousand dollars ($10,000)."

[2]  Business and Professions Code section 729, subdivision (a) provides:  "Any physician and surgeon, psychotherapist, research psychoanalyst, student research psychoanalyst, or alcohol and drug abuse counselor or any person holding themselves out to be a physician and surgeon, psychotherapist, research psychoanalyst, student research psychoanalyst, or alcohol and drug abuse counselor, who engages in an act of sexual intercourse, sodomy, oral copulation, or sexual contact with a patient or client, or with a former patient or client when the relationship was terminated primarily for the purpose of engaging in those acts, unless the physician and surgeon, psychotherapist, research psychoanalyst, student research

an unconscious person during gynecological examinations.[3]  For the counts on which the jury found defendant guilty, the jury also considered sentencing factors.

psychoanalyst, or alcohol and drug abuse counselor has referred the patient or client to an independent and objective physician and surgeon, psychotherapist, research psychoanalyst, student research psychoanalyst, or alcohol and drug abuse counselor recommended by a third-party physician and surgeon, psychotherapist, research psychoanalyst, student research psychoanalyst, or alcohol and drug abuse counselor for treatment, is guilty of sexual exploitation by a physician and surgeon, psychotherapist, research psychoanalyst, student research psychoanalyst, or alcohol and drug abuse counselor." Business and Professions Code section 729, subdivision (b)(3) provides: "An act or acts in violation of subdivision (a) with two or more victims shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, and a fine not exceeding ten thousand dollars ($10,000); or the act or acts shall be punishable by imprisonment in a county jail for a period of not more than one year, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine."

[3]  Penal Code section 289, subdivision (d)(4) provides:  "Any person who commits an act of sexual penetration, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act or causing the act to be committed, shall be punished by imprisonment in the state prison for three, six, or eight years.  As used in this subdivision, 'unconscious of the nature of the act' means incapable of resisting because the victim meets one of the following conditions:  [¶] . . . [¶]  (4) Was not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose."

4

On October 20, 2022, the jury convicted defendant of sexual battery by fraud on N.B. The jury further found the victim was particularly vulnerable and defendant took advantage of a position of trust. The jury additionally found the crime involved separate acts of violence or threats of violence.

The jury convicted defendant of two counts of sexual penetration of an unconscious person by fraudulent representation regarding J.T. The jury found J.T. was particularly vulnerable, and the crime indicated planning, sophistication, or professionalism. The jury further found defendant took advantage of a position of trust or confidence to commit the offense.

The jury convicted defendant of two counts of sexual battery by fraud on J.T. The jury again found J.T. was particularly vulnerable, the crime indicated planning sophistication, or professionalism, and defendant took advantage of a position of trust or confidence to commit the offense.

The jury acquitted defendant on three counts of sexual battery by fraud regarding Z.S. and L.B. The jury also acquitted defendant of three counts of sexual penetration of an unconscious person by fraudulent representation regarding Z.S. and L.B. The jury acquitted defendant on one count of sexual exploitation regarding Z.S., J.T., and L.B. The jury was unable to reach a

Section 289, subdivision (k) defines "sexual penetration" as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

verdict on the remaining counts regarding N.G., N.B., K.C., and P.I.

## 2. *Trial*

The trial spanned more than two months, starting on August 9, 2022, with testimony ending on September 29, 2022, and the jury returning its verdict one day (on October 20, 2022) after the JA's last conversation with the jury about the Note.

Instructing the jury on the deliberation process, the trial judge emphasized all communications with the court had to be by written note and if the jury had a question, the court would first have to discuss the question and its response with counsel: "It is your duty to talk with one another and to deliberate in the jury room." "If you need to communicate with me while you are deliberating, send a note through the bailiff signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by a written note."

"If you have questions, I will talk with the attorneys before I answer so it may take some time. You should continue your deliberations while you wait for my answer. I will answer any questions in writing or orally here in open court."

The court instructed the alternate jurors, "Do not have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express an opinion about the issues in this case, unless you are substituted for one of the deliberating jurors." (As noted below, Juror No. 15 previously had been an alternate juror.)

### 3. *Jury deliberations, including the jury's requests for readback and the Note indicating one juror had a language barrier preventing proper deliberation*

The record on appeal shows the following facts regarding jury deliberations.

On October 5, 2022, the bailiff was sworn to take charge of the jury. The trial judge ordered the alternate jurors to remain on call.

On October 5, 2022, the jury requested readback of evidence related to K.C. On October 6, 2022, the jury requested readback of portions of J.T.'s testimony. Also on October 6, 2022, the jury requested a chart from the prosecution's closing argument.

On October 7, 2022, the jury sent a request for portions of the testimony from K.C.'s former doctor. Because of "scheduling of certain jurors," the court halted deliberations until October 17, 2022.

On October 17, the jury requested readback of portions of P.I.'s testimony and readback of portions of J.T.'s testimony. The jury also asked, "Can we hear [N.]B.'s description of her two visits?" That same day, the jury asked for testimony related to a nurse practitioner in defendant's office. On October 18, the jury asked for additional portions of J.T.'s testimony.

On October 18 at approximately 2:00 p.m. Juror No. 15 replaced Juror No. 8. About an hour later, the jury sent the Note signed by Juror No. 4, the foreperson. The Note stated, "We have observed that the language barrier with Juror [No.] 15 is preventing us from properly deliberating. Juror [No.] 15 was not able to understand calls to vote guilty or not guilty, and expressed to us that his limited English interfered with his

7

understanding of the testimony, resulting in every case being the same, and his mind is already made up." No one informed counsel about the Note. The minute order dated October 18, 2022 does not reference the Note.

On October 19, 2022 at 9:00 a.m., the jury resumed deliberations. At 9:45 a.m., the jury sent a request for readback of portions of the testimony of K.C.'s prior physician. On October 19, 2022, at 12:37 p.m., the jury asked for readback of additional portions of N.B.'s testimony. None of the minute orders indicated the JA had spoken with the jury about the Note.

The jury resumed deliberating at 9:10 a.m. on October 20, 2022. Also on October 20, 2022, at 10:30 a.m., the jury wrote: "We need clarification on legal definitions of words sophistication, professionalism, 'separate acts of violence,' 'committed at different times,' and 'penetration' . . . ." At 10:50 a.m., the court answered the jury's question. At 1:09 p.m., the court provided further readback.

### 4. Verdict and sentence

On October 20, 2022, at 2:05 p.m., about an hour after the last readback, the jurors reached a verdict. On April 26, 2023, the trial court sentenced defendant to an aggregate term of 11 years in prison.

### 5. This court requests a settled statement

On appeal, it is undisputed that the trial judge did not inform trial counsel about the Note. This court granted defendant's request to augment and settle the record regarding the Note and also granted defendant's subsequent request that a judge other than the trial judge do so.

8

In connection with this court's request for a settled statement, on September 13, 2024, the trial judge filed an unsworn declaration in which he represented his statements therein "are true to the best of my recollection."  The trial judge stated that when the jury sent the "Note to Judge," he "was conducting a Teen Court at Burroughs High School in Burbank." He declared, "Upon receiving the e-mail, the court instructed the JA to inquire if they could continue to deliberate and, if not to send them home for the day."  "The JA spoke with the foreperson and juror #15."  "All jurors indicated that they could continue to deliberate."  "The Court did not notify the parties about the note nor did the court inquire with the jury."

On September 13, 2024, the JA filed an unsworn declaration in which he stated that on October 18, 2022, Juror No. 15 "was chosen at random to join the other deliberating jurors."  About an hour later at about 3:00 p.m., "jurors indicate that they have a note."  "The court called the JA and instructed to see if jurors can continue to deliberate and if not to send them home."  "JA inquired of the jurors if they can continue to deliberate and they agree to continue."  At 3:55 p.m. the jury "buzzed with a question and indicate they are done for the day." "On 10/19/22 at 9 am jurors resumes [*sic*] deliberation[.]  JA inquires with foreperson about the note to judge to which he is notified they are deliberating well and no need to address. [J]urors continue to deliberate until they reach a verdict."

On September 13, 2024, the jury foreperson, Juror No. 4 filed a declaration "true to my best recollection of these conversations," but not under penalty of perjury.  The foreperson stated, "The clerk [JA] spoke briefly to the juror in Spanish [and t]hen spoke to me and said that the juror told him he was willing

9

to deliberate. I told the clerk [JA] that I would withdraw the note." "[W]e deliberated for the rest of the day." There was a second conversation with the JA where the JA asked if the foreperson still needed to speak to the judge and the foreperson "said no." Juror No. 4 did not "recall if it was the same day or the next day" and did not identify the time of the conversation.

Defendant's trial counsel, Leonard Levine, provided a declaration under penalty of perjury. Levine averred the trial court never informed him of the Note. Levine further averred had he been informed of the Note, he would have sought to determine whether Juror No. 15 was "qualified to serve," and investigated the juror's limited English and the jury's view that Juror No. 15's mind "is already made up."

### 6.  *Hearing on the settled statement*

On November 7, 2024, in the afternoon, Judge William Ryan held a hearing to "settle the record."

At the beginning of the hearing, the trial judge's counsel indicated that at 10:30 that morning, he had served a motion to quash the subpoena defendant had served on the trial judge on October 28, 2024. The prosecutor sided with the trial judge in indicating she "did not find it necessary to call Judge Carter" as a witness. Ultimately, Judge Ryan quashed defendant's subpoena.

At the same time he filed his motion to quash, the trial judge provided a declaration, now under penalty of perjury. The trial judge averred the following: The case was tried in complex criminal court on the 9th floor and the bailiff was responsible for security. The judge continued, on October 18, 2022 at 9:00 a.m., Juror #8 notified the JA of a financial burden. At 9:28 a.m., the trial judge held a conference call with counsel to discuss Juror #8's financial burden. At 1:55 p.m., counsel agreed Juror #8

10

could be excused. Juror #15 was selected to replace Juror #8. At 2:00 p.m., the jurors were called into the courtroom and instructed to start their deliberations anew. According to the trial judge: "Based on the record, I am informed and believe that at the 3:00 p.m. break, the jury foreperson approached the JA with a 'Note to Judge.'" The trial judge did not identify the "record" he used to reach this conclusion.

The trial judge continued: "At 3:04 p.m., the JA emailed me the exact wording of the note." "Upon receiving the JA's email, I called the JA and instructed him to inquire of the jury if they could continue to deliberate and, if not, to send them home for the day." "Based on the record, I am informed and believe that all jurors indicated that they could continue to deliberate." "Based on the record, I am informed and believe that at 3:53 p.m., the jurors indicated that they had a question and wished to end deliberations for the day." Again, the trial judge's declaration does not identify the "record" on which he was relying. The trial judge continued: "When the jury returned the next day on October 19, 2022, I inquired with the JA regarding the 'Note to Judge.' The JA informed me that the request had been withdrawn and that the jury was deliberating." "At 9:00 a.m., the jury resumed deliberations."

The trial judge acknowledged, "I did not notify the parties nor did I inquire with the jury about the 'Note to Judge'." The trial judge stated that in September 2024, he had a conversation with the JA about whether "any part of his conversation with the jury about the 'Note to Judge' was in Spanish. The JA responded that he did not recall."

11

The JA testified at the hearing before Judge Ryan. He said he was "in charge" of the jury when they started deliberating. The JA also testified he was not sworn to take charge of the jury.

The JA described a process during jury deliberations where he would contact the parties if the jury had a question. The JA "[v]aguely" remembered that on October 18, 2022, there was a discussion that Juror No. 8 could not continue to serve as a juror. The JA remembered that Juror No. 15 substituted in for Juror No. 8. The trial judge instructed the jurors to begin their deliberations again because a new person was on the jury.

The JA also testified the jury sent the Note at approximately 3:00 p.m. on October 18, 2022, about one hour after Juror No. 15 joined the jury. The JA did not enter the Note in the docket because according to him, the Note did not include a question. He said, "I only enter the questions."

The JA then testified he went to the jury room and spoke to the juror "who was closest to the door" because that juror "would hand [him] the question." The JA "read it to the jurors for clarification to determine exactly what" the jury wanted. All of the jurors "concur[red]" that they wanted what was in the Note. The JA did not recall whether Juror No. 15 responded. The JA then left the jury room and e-mailed the trial judge, who was in "teen court."

The JA further testified when the trial judge called him about the latter e-mail, the trial judge told him to enter the jury room and ask the jurors if they could "continue to deliberate" and if not, tell them to "stop for the day, and then we would handle it in the morning." When asked whether he understood that the Note indicated "they couldn't properly deliberate because of a language barrier by Juror [No.] 15," the JA answered, "Honestly,

12

I never pay attention to what it says. I just send it out." The JA stated he and the trial judge "had a conversation" about the fact that the jurors stated they could not deliberate but the JA did not recall the contents of that conversation.

After speaking with the trial judge, the JA went to the jury room to ask the jurors if they could continue to deliberate. He did not recall exactly what he said. He did not recall exactly what the jurors said but he remembered the jurors "felt that [Juror No.] 15 wasn't able to cooperate, to which he [Juror No. 15] responded 'Yes, I can.'" The JA then spoke to Juror No. 15 in Spanish. The JA did not recall whether he spoke to other jurors in Spanish. He was "pretty sure half of" the jurors spoke Spanish.

According to the JA, Juror No. 15 told him, "'I do understand English. I do know what is going on. Can I explain to you in Spanish? I feel more comfortable.'" The JA testified that Juror No. 15 "wanted to go into what they were deliberating" and the JA "stopped him." The JA also testified Juror No. 15 said in Spanish: "'They think that I don't understand English, but I do.'" The JA did not remember whether Juror No. 15 said anything else. The JA testified he told Juror No. 15, "I don't want to know your opinions at [this] point. I just want to make sure that if you guys can continue to deliberate or not." The JA added, "And from what he was saying, he was cooperating with them. They were just not agreeing to the full of his answers. I'm not sure which way he was swinging. I don't know none [*sic*] of that."

The JA added: "At one point, I don't remember exactly where, I did tell him I need to refrain [*sic*] back to English because everyone needs to understand what I'm saying. But I

13

do not recall exactly at what point I said that, but I do remember telling everybody that everyone's entitled to their [*sic*] own opinion." The JA reiterated that he told the jurors: " 'Everyone is entitled to their [*sic*] own opinions. It's whether or not you guys can work together to reach a decision. If that can't be, then we'll end for the day and come back tomorrow and fix it.' "

The JA then testified he asked all the jurors if they could continue to deliberate and "[t]hey said yes." All the jurors "agreed to continue." When asked whether he told the other jurors that Juror No. 15 could deliberate, the JA testified, "I think I told everybody at the same time." When asked whether the jurors withdrew the Note on October 18, 2022, the JA testified, "Yeah. They continued to deliberate." The JA did not recall whether he told the trial judge about his conversation with Juror No. 15.

The JA said he did not send the Note to the parties because the trial judge did not instruct him to do so. The JA added he would never ask the trial judge whether to send a note to the parties.

The JA stated that on the next day, October 19, 2022, at the trial judge's direction, the JA went into the jury room to ask the jurors if they were " 'still willing to deliberate' " and, according to the JA, the jurors answered affirmatively. The JA testified the foreperson said, "that things were going good, and they were reaching a conclusion fairly soon." The JA then said the jurors told him they wanted "to withdraw" the Note. He also testified he did not recall whether the jurors used the word "withdraw." When he asked the foreperson if "the note needed to be addressed," the foreperson responded, " 'We're good.' " The JA believed "[t]he note was resolved." The JA did not "think" he had

14

any discussion on October 19 with Juror No. 15. He testified he never asked the trial judge whether, at that point, he should "make the parties aware" of the Note, nor did "Judge Carter say anything to [him] about letting the parties know about the note."

When asked how the Note entered the court file, the JA testified that after the jury finished deliberating, he cleaned the jury room. "Everything that says Questionnaires . . . I grab them all together, make copies. Redacted copies go into the file." The Note was "part of that packet" of questions. When the JA retrieved the jury questions, he did not notify the parties about the Note.

After the JA's testimony, defendant's counsel referenced attorney Levine's declaration. The prosecutor responded, "Mr. Levine wasn't present on the issue [t]hat the Court of Appeal is going to decide[;] the only thing he can add is what the prosecution can add. We didn't get notice of the note, period." Judge Ryan stated, "I don't think I need Mr. Levine's . . . declaration to flush out anything . . . [¶] . . . [¶] in the settled statement." Defense counsel reiterated, and it was undisputed that, Levine would have made an "immediate motion" to determine whether Juror No. 15 was qualified to serve. Although present, Levine did not testify before Judge Ryan. Neither party called Juror Nos. 4 and 15 to testify, although they were present in court.

There was no evidence at the hearing that even upon his return on October 19th, the trial judge asked the jury or the foreperson, Juror No. 4, about the Note and its withdrawal.

15

### 7. *Judge Ryan Forwarded Corrales's Testimony In Lieu of a Settled Statement*

Judge Ryan's "Order re: settled statement on appeal" recites in relevant part: "On November 7, 2024, the court conducted an evidentiary hearing at which the trial court's Judicial Assistant . . . was the only witness. As his testimony covers the issues that would otherwise need a settled statement, the Clerk is ordered to prepare [a] supplemental clerk's transcript and reporter's transcript" "of the November 7, 2024[ ] evidentiary hearing . . . ."

### DISCUSSION

Defendant argues he was denied his Sixth Amendment right to counsel during jury deliberations because the trial court did not notify counsel about the Note. The Sixth Amendment to the federal Constitution "guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e.' " (*United States v. Gouveia* (1984) 467 U.S. 180, 187; see also *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001 [criminal defendant has the right to be represented by counsel at all critical stages of the prosecution]; *People v. Rubalcava* (1988) 200 Cal.App.3d 295, 299 [jury deliberation is a critical stage of trial].)

Respondent concedes, " 'A jury request . . . during deliberation is a critical stage of the prosecution during which the right to counsel applies.' " Respondent concedes all communications with the jury should occur in "open court, with prior notification to counsel," and that defendant was denied that constitutional right when trial court did not inform counsel about the Note. Respondent further concedes a juror who does not

16

understand English well enough to participate in deliberations cannot serve as a juror.  With respect to prejudice, respondent acknowledges its burden to prove lack of prejudice beyond a reasonable doubt.  (*People v. Bradford* (2007) 154 Cal.App.4th 1390, 1395.)  This appeal thus turns on whether respondent has met its burden to demonstrate lack of prejudice when the trial court did not inform counsel about the Note.

We begin with the legal principles relevant to ex parte, off-the-record communications with a deliberating jury.  We then explain why respondent fails to show beyond a reasonable doubt the constitutional error did not prejudice defendant.[4]

## A.  Well-Established Legal Precedent Prohibits Ex Parte Communications With a Deliberating Jury and Requires Reversal Unless the People Can Demonstrate Lack of Prejudice Beyond a Reasonable Doubt

More than 40 years ago, our high court counseled, "[I]t has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel."  (*People v. Hogan* (1982) 31 Cal.3d 815, 848 (*Hogan*), overruled on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836; see also *Rushen v. Spain* (1983)

---

[4] Defendant also filed a motion for summary reversal.  He acknowledges that motion makes the same argument "substantively verbatim" regarding the trial court's failure to inform trial counsel about the Note that he is making on appeal.  This court deferred ruling on that motion to the panel deciding this appeal.  Our consideration on appeal of what appellant concedes is the identical issue moots defendant's motion for summary reversal.

464 U.S. 114, 117 [right to counsel at all critical stages of trial is a criminal defendant's "fundamental right"].) " ' "This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case." ' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 384 (*Jennings*).)

Our high court deems ex parte conversations with a deliberating jury "serious error." (*Hogan*, *supra*, 31 Cal.3d at p. 848; *ibid.* [failure to notify counsel of jury's request for certain exhibits was prejudicial error].) Our high court also has described respondent's difficult burden to avoid reversal in the face of such error, "if the denial of the right to counsel during jury deliberations may have affected substantial rights of a defendant, prejudice is presumed and '[o]nly the most compelling showing to the contrary will overcome the presumption.' " (*Id.* at p. 849, quoting *People v. Knighten* (1980) 105 Cal.App.3d 128, 133.) This burden is in recognition of "[w]hen faced with a record of a proceeding conducted without counsel, a reviewing court assessing possible prejudice is compelled to speculate as to what might have occurred had counsel been present. The uncertain nature of such a determination requires the strong presumption of prejudice." (*Hogan*, at p. 850; see also *Jennings*, *supra*, 53 Cal.3d at p. 385 [this burden was satisfied where judge's ex parte discussion with the jury about deadlock on one of many counts was a correct statement of the law and "the court promptly notified defense counsel of its action and encouraged counsel to review the court reporter's notes and suggest a further admonition, if desired"].)

18

Our high court applied these principles in *Hawthorne, supra*, 4 Cal.4th 43. There, a bailiff interacted with the jury when the trial judge was on vacation. (*Id*. at p. 61.) There was no reporter's transcript of that interaction. The clerk's transcript was terse: " 'A written question is received from the jury. The Bailiff calls Judge Lew at home and receives instructions which he relays to the jury. The question is filed and placed in the court file.' " (*Ibid*.) A different trial judge (Judge Munoz) prepared the settled statement: " 'On December 16, 1985, the trial judge was called at home by the bailiff and told that the jury had reported that one member was undecided. The court provided instructions to the bailiff which the bailiff then relayed to the jury. It is impossible to determine, and no one remembers, what instructions were given and relayed to the jury.' " (*Id*. at pp. 61–62.)

Subsequently, our high court requested an additional settled statement regarding the parties' off-the-record alleged agreement as to how to handle jury questions when the trial judge was on vacation. (*Hawthorne, supra*, 4 Cal.4th at pp. 62–63.) Yet a different judge (Judge Reid), while preparing the additional settled statement, had an ex parte communication with Judge Lew. Judge Reid asked Judge Lew to review the court file "to determine whether he might recall any pertinent facts." (*Id*. at p. 62.) In a subsequent declaration, Judge Lew stated, he "instructed the bailiff to advise the jury to continue to deliberate until an answer was returned by the court and to have the clerk contact the attorneys to inform them of the inquiry. 'Immediately' after the first call, he received a second call from the bailiff informing him the jury wished to continue to deliberate without receiving an answer. He thereupon instructed the bailiff

19

to have the question placed in the file and have the jury continue to deliberate. Also at Judge Lew's direction, counsel were never contacted regarding the matter." (*Id.* at pp. 62–63.) In light of this new declaration, the parties were allowed to examine Judge Lew in a hearing, and afterwards, the judge [Judge Reid] "prepared an engrossed settled statement." Judge Reid's engrossed settled statement "substantially" conformed to Judge Lew's declaration "as reiterated in his testimony." (*Id.* at p. 63.)

In considering the bailiff's communication with the deliberating jury, our Supreme Court "strongly reiterate[d] the proscription against 'private communications between court and jury' . . . . [Citation.]" (*Hawthorne*, *supra*, 4 Cal.4th at p. 69.) The court found the settled statement reliable and based on that statement, concluded the error was harmless beyond a reasonable doubt. (*Ibid.*) The high court explained: "[I]n this particular case, the record reasonably supports the conclusion the bailiff told the jury nothing more or less than to continue their deliberations, as they were already doing. We have no evidence the jurors had deadlocked . . . or had reached an impasse they would likely resolve other than in accordance with their individual judgment." (*Id.* at p. 67.) It then rejected the defendant's argument to the contrary, which hinged on an interpretation of the clerk's transcript that the court had rejected. (*Id.* at p. 65.) The high court concluded that the settled statement was reliable because, inter alia, "[a]ll parties were examined under oath and assessed credible in their testimony by an impartial judicial officer unconnected to the trial proceedings." (*Ibid.*) The high court further concluded, "Having determined the settled statement is more creditworthy" [than the clerk's transcript where the clerk was not a percipient witness], the high

20

court was "bound" by the settled statement because the "trial judge [the preparer of the settled statement] has full power over the record, and as long as he does not act arbitrarily, his action is final. [Citations.]' [Citations.]" (*Id.* at pp. 65–66.)

## B. The Right to a Jury Trial Includes the Right to Jurors With Sufficient English Language Capability To Deliberate

A juror who does not understand English enough to deliberate cannot serve as a juror. In the words of our high court: " 'Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly render[s] a juror "unable to perform his duty". . . .' [Citations.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 566 (*Lomax*); accord, *People v. Szymanski* (2003) 109 Cal.App.4th 1126, 1132 [trial court committed reversible error in not excusing a juror where record established juror's inability to understand English sufficiently to serve as a juror].) We also acknowledge that mere "language difficulties" do not render a juror unable to perform. (*People v. Elam* (2001) 91 Cal.App.4th 298, 318; *ibid.* [juror wrongfully discharged where "[t]he record does not establish ' "as a demonstrable reality" ' that Juror No. 3's language difficulties, as opposed to his failure to deliberate well, his reliance upon faulty logic or analysis and his disagreements over the law and the evidence, accounted for the difficult deliberations the jury was experiencing."].)

A trial court may discharge a juror if the juror's inability to perform a juror's duties comes to light during the trial. "A juror may be discharged if, at any time before or after final submission of the case, the court upon good cause finds the juror 'unable to perform his or her duty.' [Citation.]" (*Lomax, supra,* 49 Cal.4th

21

at p. 565; *id.* at p. 567 [affirming excusal of a juror for limited language ability and after "revealing he would not be able to serve as a fair and impartial juror"]; see also *People v. Williams* (1996) 46 Cal.App.4th 1767, 1780–1781 [affirming the dismissal of a juror whose "conduct apparently transformed the deliberation process into an exercise in futility"].)

A trial court also has "a duty to conduct reasonable inquiry into allegations of juror . . . incapacity — always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*); *ibid.* [considering challenge to jury instruction requiring jurors to advise the court if a juror is unable to deliberate].) Where a trial court learns "of allegations which, if true" would constitute good cause for a juror's discharge the court "must hold a hearing." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69; *ibid.* [rejecting the argument that the trial court should not have questioned jurors about alleged juror misconduct]; *People v. Cleveland* (2001) 25 Cal.4th 466, 485–486 [holding that the trial court erred in discharging juror because the record did not establish a " 'demonstrable reality' " that the juror refused to apply the law or otherwise refused to deliberate].)

The Note raised a question as to whether Juror No. 15 had sufficient command of English to perform his duties as a juror. It is undisputed, including by the trial judge, that the court did not inform counsel of the Note and counsel had no opportunity to suggest questions to the trial judge, or to be heard as to whether Juror No. 15 was qualified to remain on the jury.

22

**C.    Respondent Fails To Show the Deprivation of Counsel Was Harmless Beyond a Reasonable Doubt**

Respondent fails to demonstrate that the deprivation of counsel was harmless beyond a reasonable doubt for two reasons. First, the JA was unable to recall critical parts of his discussion with the jury making it impossible to determine exactly what happened.  Second, although the JA testified the jury resolved the issues expressed in the Note, the record does not reflect how they resolved those issues.

The JA repeatedly testified he could not remember many details of his conversations with the jurors.  The JA testified he could not recall what he told the jurors when he went into the jury room.  When asked, "How did you see if they could continue to deliberate?"  The JA answered, "I don't remember, but I would have, I mean, obviously ask them if they can continue or if they were ending for the day."

The JA also did not recall what the jurors told him when he was in the jury room, but "remember[ed] something . . . happened" that concerned Juror No. 15's "cooper[ation]."  The JA did not recall whether he spoke Spanish to jurors other than Juror No. 15.  The JA did not recall everything Juror No. 15 said when they spoke in Spanish.  Although the JA initially testified the jurors wanted to withdraw the Note, he later testified he did not recall whether the jurors used the word "withdraw."  The JA did not recall whether on October 19, 2022 (the day after the jury sent the Note), he had any conversation with Juror No. 15.  Also according to the declaration the trial judge filed under oath, the JA did not recall whether he spoke to Juror No. 15 in Spanish, notwithstanding the JA's recollection to the contrary at the hearing.

23

Second, the Note raised questions as to Juror No. 15's ability to serve as a juror, and the JA's testimony did not show that the jury "resolved" that issue a manner consistent with defendant's right to a jury trial by competent jurors. The JA did not testify he assessed Juror No. 15's English language facility. He testified Juror No. 15 reported he understood English, arguably a hearsay statement.[5] Indeed, the JA testified he conversed with Juror No. 15 in Spanish, at that juror's request. Juror No. 15's statement to the JA that he understood English merited additional investigation given 11 fellow jurors perceived that Juror No. 15 had a language barrier significant enough to interfere with his participation in jury votes and with his understanding of the testimony.

Respondent emphasizes, although the JA could not recall, the JA was "pretty sure" the jury "withdr[ew]" the Note, and in any event the issue in the Note had been "resolved." The JA's testimony that the jury "resolved" the issue does not elucidate the nature of the resolution. The JA did not testify that the 11 jurors initially were mistaken in their conclusion Juror No. 15 was unable to deliberate and later corrected their initial assessment. The JA offered no testimony supporting the conclusion the jury resolved the issues raised in the Note in a manner dispelling prejudice from the violation of defendant's right to counsel.

Although it is possible the jurors were mistaken in their assessment of Juror No. 15, it is also possible the jury resolved their concerns in another fashion. (See *United States v. Dellinger*

_____

[5] The JA testified that when he spoke to Juror No. 15, Juror No. 15 said, "I do understand English. I do know what is going on. Can I explain to you in Spanish? I feel more comfortable."

(7th Cir. 1972) 472 F.2d 340, 379–380 [communication by judge and marshal with deliberating jury prejudicial because the verdict may have been "the result of compromise between some who may have desired to acquit entirely and some who may have desired to convict"].) It is possible that Juror No. 15 "follow[ed]" the other jurors, something he admitted during voir dire that he had done when he served on a prior jury.[6] Assuming, as respondent argues, "[The JA] believed that the note had been 'resolved,'" the JA's belief does not address how the JA "resolved" whether Juror No. 15 was qualified to serve as a juror, especially when the afternoon before, the other 11 jurors perceived the juror did not have sufficient language capability to deliberate.

In a footnote on appeal, respondent refers to the unsworn statement of Juror No. 4. In that unsworn statement, Juror No. 4 asserted that to the best of his recollection, the JA told him Juror No. 15 was willing to deliberate and then Juror No. 4 responded he would withdraw the Note. If anything, if credited, Juror No. 4's statement would support that the JA's ex parte communications prejudiced defendant. One could infer the JA persuaded the foreman to withdraw the Note by telling the foreman that Juror No. 15 could deliberate.

The striking differences between this case and *Hawthorne* demonstrate respondent here has failed to carry its burden to show the error was harmless beyond a reasonable doubt. First,

---

[6] During voir dire, Juror No. 15 stated that he spoke primarily Spanish. When asked by the prosecutor if he had served on a jury before, Juror No. 15 answered, "Yes, but I don't know how I did. I follow the other ones." When asked if he was able to communicate with the other jurors, Juror No. 15 responded, "I think so."

25

the issue raised in the jury question in *Hawthorne* involved one juror being undecided.  No concern was raised in *Hawthorne* that that juror may have been unqualified to serve, an issue that impinges on defendant's right to a jury trial.  (See *Engelman*, *supra*, 28 Cal.4th at p. 442.)  In *Hawthorne*, "[a]ll parties were examined under oath and assessed credible in their testimony by an impartial judicial officer unconnected to the trial proceedings." (*Supra*, 4 Cal.4th at p. 65.)  Here, only the JA was examined under oath.  Although Jurors Nos. 4 and 15 were at the hearing, they did not testify.  In *Hawthorne*, the trial judge testified about the events regarding the jury question and his and his bailiff's ex parte conversations, and the parties had an opportunity to cross-examine the trial judge.  Here, the trial judge did not testify and the parties thus had no opportunity to cross-examine him regarding his declaration.

Additionally, in *Hawthorne*, the bailiff and jurors had only a "ministerial exchange" (*supra*, 4 Cal.4th at p. 68) with the bailiff telling the jurors to continue their deliberations (*id*. at p. 67).  Here, the JA told the jurors more than just to continue their deliberations.  His conversations with the jurors — sometimes in Spanish — the contents of which he did not entirely recall, cannot be described as only a "ministerial exchange." They were occasioned by the other jurors' concern about whether Juror No. 15 was qualified to serve as a juror.

*Moore v. Knight* (7th Cir. 2004) 368 F.3d 936 (*Moore*) supports our conclusion that the trial court's deprivation of counsel at a critical stage in the proceedings was not harmless beyond a reasonable doubt.  *Moore* involved postconviction proceedings to investigate ex parte communications between a judge and deliberating jury.  (*Id*. at p. 941.)  The jury, who was

deliberating a rape charge, sent the judge a note asking factual questions, and the judge asked the bailiff to respond. (*Id*. at p. 938.) Eight years after the conviction, the trial court held a hearing to determine what occurred and the court found, " '[T]he trial court judge directed the bailiff to tell the jurors that their questions could not be answered and that no further questions would be allowed.' " (*Id*. at p. 941.) The trial court "then held that, [because] 'no juror testified that the failure to answer the questions affected their deliberation process . . . such error was harmless.' [Citation.]" (*Id*. at p. 942.)

The federal appellate court explained, "When ex parte communications with the jury occur off the record, determining whether those communications resulted in prejudice poses a vexing problem . . . ." (*Moore, supra*, 368 F.3d at p. 940, italics omitted.) The federal appellate court rejected the trial court's findings as "an unreasonable determination of the facts" (*id*. at p. 942) because the "evidence heard at the post-conviction proceeding was too sparse and ambiguous to support such a conclusion" *and* the trial judge did not testify as to what occurred (*ibid*). Additionally, even if the evidence supported the trial court's findings, the trial court "never actually addressed what the jury was told during the ex parte communications." (*Id*. at p. 943.)

The federal appellate court also found the bailiff's ex parte communication was not harmless beyond a reasonable doubt: "[T]he evidence . . . certainly is not strong enough to meet the government's heavy burden necessary to overcome the presumption of prejudice." (*Moore, supra*, 368 F.3d at p. 943.) "The post-conviction court's failure to consider the role of the Bailiff, however, also raises a second, and more worrisome

27

problem:  even if the above-described evidence were sufficient to support the court's factual findings, those factual findings never actually addressed what the jury was told during the ex parte communications — this half of the inquiry is a necessary component of any determination of prejudice." (*Ibid.*, italics omitted.)

Similarly here, the evidence at the settled statement hearing is insufficient to show what the jury was told during the ex parte communications with the JA.  The evidence also does not show how the jury resolved the concerns they raised in the Note.  Without this evidence, we cannot conclude the admitted error in failing to inform counsel of the Note was harmless beyond a reasonable doubt.

Respondent's authorities are not apt.  Respondent cites *People v. Oliver* (1987) 196 Cal.App.3d 423, 436 (*Oliver*) and *People v. Nunez* (1983) 144 Cal.App.3d 697 (*Nunez*) in support of its argument that the trial court's failure to advise counsel about the Note was not prejudicial.  Neither case involved a Note where 11 jurors questioned the 12th juror's competence to serve.

In *Oliver*, the jury in a rape trial requested readback of the defendant's and the victim's testimony. (*Supra*, 196 Cal.App.3d at p. 426.)  The reporter who transcribed the defendant's testimony and the reporter who transcribed the victim's testimony read back the testimony in the jury room. (*Ibid*.)  The reporter who read the defendant's testimony paused during the reading of the testimony to allow the jury to discuss "the significance of various bits of testimony." (*Ibid*.)  The reporter did not participate in the jury's discussions. (*Ibid*.)  All 12 jurors provided declarations indicating the reporter "said nothing and gave no indication of her thoughts on the matters discussed." (*Id*.

at p. 427.) The trial court found that the reporter's presence during the deliberations was "prejudicial error per se" and the People appealed. (*Ibid.*) The appellate court found constitutional error, but concluded it was not reversible per se. (*Id.* at p. 435.) The court further held the "innocuous presence of the court reporter" was not prejudicial. (*Id.* at p. 436.)

We fail to discern how the silent presence of a court reporter during readback is relevant where here, the JA conversed with some jurors in Spanish and the entire jury in English about a juror's perceived ability to deliberate. We also fail to see how *Oliver* informs us on prejudice where here, the trial judge never asked the jury about the Note and never informed counsel about the Note's existence.

In *Nunez*, in the absence of defense counsel, the trial court removed a juror and seated an alternate juror in her place. (*Supra*, 144 Cal.App.3d at p. 701.) Also in the absence of defense counsel, the court allowed readback of testimony in open court. (*Ibid.*) Although the appellate court found "serious error," it did not conclude the error prejudicial. The court explained, "[T]here is nothing in the record to indicate the alternate previously found acceptable did not continue to be so." (*Id.* at p. 702.) "Similarly, while a defendant and his attorney have a protectible interest in what testimony is to be reread to the jury," the evidence that was reread was not detrimental to defendant or was evidence he did not deny. (*Ibid.*)

Here, in contrast to *Nunez*, there was a question, within about one hour of Juror No. 15's substitution as a juror, about whether Juror No. 15 was qualified to continue to be a juror. In the Note, the foreman indicated, inter alia, that Juror No. 15 did not speak English well enough to participate in deliberations.

The next morning, when the JA again entered the jury room, the jurors changed their mind and according to the JA, withdrew or resolved the Note — he did not remember which. *Nunez* is thus not instructive on the prejudice issue before us.

In summary, we agree with the parties that defendant was denied his right to counsel when the trial judge failed to inform counsel of the Note. We also conclude respondent has failed to demonstrate that that this constitutional error was harmless beyond a reasonable doubt because the JA's testimony does not inform us as to what the JA told the jury that caused the jurors to change their mind about Juror No. 15's ability to deliberate or otherwise show how the jury resolved the issues raised in the Note.[7]

We recognize the burden on the trial court and regrettably, on the witnesses, in requiring retrial of a case involving multiple victims and delving into the conduct of intimate medical

---

[7] Our opinion is based on the jurors' collective perception that Juror No. 15 had limited English ability as expressed in the Note, not on any evaluation by us of Juror No. 15's language capability.

Because we reverse the judgment, we do not address defendant's following other arguments: (1) the trial court improperly excluded purported evidence of the victims' financial bias from settlements of their civil case; (2) the trial court erred in admitting expert opinion, which according to defendant, lacked foundation and was conclusory, misleading, and irrelevant; and (3) the trial court erred in admitting evidence from N.B.'s physician describing N.B.'s report of defendant's conduct. We also do not address respondent's argument regarding modification of the abstract of judgment because it allegedly incorrectly reflects the sentence the trial court imposed.

examinations.  The importance of the constitutional right to counsel at critical junctures in a criminal trial gives us no other choice.

## DISPOSITION

The judgment is reversed.  The case is remanded for retrial. <u>CERTIFIED FOR PUBLICATION.</u>


BENDIX, Acting P. J.


We concur:



WEINGART, J.



M. KIM, J.

31